# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| Nick McClure, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>Toyota Motor Corporation, Toyota Motor North America, Inc., Toyota Motor Manufacturing Canada, Inc., and Toyota Motor Sales, U.S.A., Inc.<br><br>Defendants. | Civil Action File No. _____<br><br>**Complaint – Class Action**<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Nick McClure, individually and on behalf of all those similarly situated, files this class action suit against Defendants Toyota Motor Corporation ("TMC"), Toyota Motor North America, Inc. ("TMNA"), Toyota Motor Manufacturing Canada, Inc. ("TMMC") and Toyota Motor Sales, U.S.A., Inc. ("TMS") (collectively, "Toyota" or "Defendants"), based upon his personal knowledge as to facts specific to him in an individual capacity and based upon the investigation of counsel in all other respects, and alleges as follows:

## NATURE OF THE ACTION

1.     This is a class action on behalf of all current and former purchasers and

lessors of the 2020 Toyota RAV4[1] (the "Class Vehicles" or "Vehicle(s)"). These Vehicles suffer from a defect that causes their battery power to drain while the Vehicle is turned off. The drain of electricity from the battery quickly disables the battery, making it impossible to turn the Vehicle on without exogenous power. The defect causes other components of the Vehicle's electrical system and safety features to malfunction—such as the engine alternator, the headlights and taillights, and the power steering mechanism. The defect poses a safety hazard for drivers and passengers who are stranded when their Vehicle's battery fails prematurely, its engine stalls suddenly in the midst of traffic, or when the Vehicle veers dangerously out of its driving lane because its steering has malfunctioned.

2.      The defect stems from the failure of electrical system components that regulate the flow of electricity from the battery, called "Electronic Control Modules," and from the drainage of electricity by the electrical systems that these "ECMs" govern. In a vehicle that is free of defects, ECMs prevent excessive drainage of electricity from the battery to other Vehicle components while the engine is turned off. In the Class Vehicles, the ECMs fail to prevent this drainage. Instead,

---

[1] This includes all configurations and trim levels of the 2020 Rav4, including the LE, XLE, XLE Premium, Adventure, TRD Off-Road, Limited, LE Hybrid, XLE Hybrid, XSE Hybrid, and Limited Hybrid.

they and their associated electrical subsystems continue to draw electricity from the battery when the Vehicle is not in use, causing "parasitic drain" on the battery. Defendants have designed, manufactured, sold, or leased each of the Class Vehicles to consumers with this "Parasitic Drain Defect."

3.      Toyota's marketing aims to convince consumers that the Class Vehicles are of the highest quality, made with the utmost care and, most importantly, are safe and dependable. But Toyota has misrepresented and actively concealed the existence, causes, and consequences of the Parasitic Drain Defect, which results in the failure of the Vehicles' essential purpose to transport drivers and passengers reliably and safely.

4.      The effects of the Parasitic Drain Defect are numerous and disabling. Parasitic drain reduces the charge of the Vehicles' batteries below the threshold needed to start their engines. Defendants assure Vehicle owners and lessors that the Class Vehicles maintain a normal battery life of 3-5 years. Their representation is false and misleading, however, because the Defect causes the battery to deplete well before the normal battery life cycle, within months or even days of a consumer's taking possession of the Vehicle. While in this state the Vehicle is inoperable until the battery is recharged through extraneous means. The relief provided by this recharge is only temporary, however, because the parasitic drain will inevitably

cause the battery to fail again. The Parasitic Drain Defect causes the premature obsolescence of the affected vehicle's battery, requiring it to be replaced, and damages the engine alternator, which is put under excessive strain by the premature failure and depletion of the battery.

5.      In addition to causing the Class Vehicles to fail in their most indispensable feature—that is, of reliably turning on when the ignition is turned— the Defect is a safety issue. Because the Parasitic Drain Defect drains batteries, many owners and lessees of Class Vehicles have found themselves stranded and without reliable transportation when their batteries fail unexpectedly, prior to the expiration of their normal and advertised three-to-five year lifecycle. Further, the Defect can cause Class Vehicles to lose function in one or more of their electrical components, including federally mandated safety features such as headlights and hazard lights. Prolonged and recurrent battery depletion results in the overuse of the vehicle's alternator (which replenishes the battery when the engine is on), which causes the Vehicle's engine to stall while in use. The Defect also impairs the Class Vehicles' power steering mechanism, causing the Vehicles to drift off-center and even to veer dangerously between driving lanes.

6.      Defendants became aware of the Defect prior to January 2019 through their extensive pre-release testing of the Vehicle. Toyota subjects all of its new

vehicle models to "Failure Mode and Effects Analysis"("FMEA"), which is a methodology for testing automobiles for defects and isolating the causes of such defects prior to their marketing and distribution. Subjecting new vehicles to FMEA testing has been a standard practice in the automobile industry since the 1970s. Toyota is a pioneer in the field of FMEA, having developed its own, enhanced version of FMEA in the 1990s. Defendants have continually improved upon their FMEA procedures and apply them to all of their vehicle models during the product development process and prior to commencing the marketing and distribution of manufactured vehicles.

7.      Through their application of FMEA and other pre-release testing to the Class Vehicles, Defendants were aware that the Class Vehicles' ECMs and electrical system components drain the Vehicles' batteries at an excessive rate, causing the risk of steering malfunction, sudden and unexpected stalling, and failure of the Vehicles to turn on with the ignition. Once sales and leasing commenced, Defendants were made aware of the Defect from numerous sources, including voluminous and nearly identical customer complaints receive by Defendants' customer service department about prematurely dead batteries, in addition to warranty claims and the volume of replacement batteries shipped to dealers.

8.     But Defendants did nothing to warn consumers of the Defect. Instead, they did everything in their power to suppress it. Defendants began offering the Vehicles for sale in the fall of 2019. As Defendants were commencing delivery of the Class Vehicles to their dealership in January 2019, they told their dealers, on a pre-release basis, that the Vehicles suffered from parasitic drain, and instructed the dealers to test the Vehicle battery no more than *two days* before delivering the Vehicle to the lessor or purchaser, and to disconnect the batteries from the Vehicles in storage if they were not driven for as little as one week. These measures reflected Defendants' awareness that the Vehicles suffered from a defect that caused their batteries to drain at an excessive rate—indeed, that the batteries could become depleted in as little as two days— and were intended to conceal the Defect from consumers until after the Vehicles had been delivered.

9.     Defendants' efforts to conceal the Defect have continued ever since. When Plaintiff and Class Members experience the effects of the Defect and present their Vehicles to Defendants' authorized repair centers, Defendants do not acknowledge the existence of the Defect, and make no attempt to repair it. Rather, they do everything possible to avoid acknowledging its existence, including misattributing the Defect to unrelated Vehicle components, or offering absurd excuses that shift blame onto consumers—such as telling consumers that steering

drift caused by the Defect is brought on, not by the Defect, but by slanted roads, or insisting that consumers are to blame for keeping the Vehicle's key fob "too close" to the Vehicle, as is necessary to open and operate it. All the while, Defendants have continued to maintain a deceptive marketing campaign aimed at persuading consumers that their Vehicles are, in the words of one advertisement that aired in Georgia, "the ultimate driver companion day in, day out."

10.     Because Defendants misrepresent and actively conceal the existence, causes, and consequences of the Defect, Plaintiff and every Class Member has overpaid premium prices for a vehicle that does not start, and when it starts, exposes driver and passenger alike to steering malfunctions, engine failures in the midst of traffic, and being stranded without access to transportation when the battery dies well before its time. In addition, owners and lessees of Class Vehicles each have had to pay hundreds or thousands of dollars for premature battery replacements, repair services (such as diagnostic services, roadside assistance, and towing), and unnecessary accessories such as mobile battery jump packs and trickle chargers.

11.     Consistent with their ongoing efforts to conceal the Defect, Defendants have failed to adopt any solution or adequate repair for it. Defendants lease and sell the Class Vehicles subject to written warranties that profess to guarantee the repair of the Vehicles for defects. Defendants provided the warranty with full knowledge

that the Parasitic Drain Defect subsists in the Class Vehicles and that, because Defendants have no adequate repair for it, the Defect would continue to manifest long after the expiration of the warranty's mileage and duration limits. True to Defendants' intentions, the warranty has failed of its essential purpose: Class Members who attempt to avail themselves of Toyota's warranties by presenting their Vehicle for repair are told by Toyota's dealers that there is nothing wrong with their Vehicle, or that if something appears to be wrong, they cannot even identify the source of the problem, let alone fix it. Instead, Defendants' agents offer superficial "quick fixes," such as replacing failed batteries, attributing the problem to unrelated Vehicle components, blaming consumers themselves, or telling owners and lessees to buy auxiliary power sources, none of which corrects the underlying defects in the ECMs and associated electrical subsystems that cause the batteries to fail. These temporary measures leave Class Members with Vehicles that will ultimately fail again, for the same reasons.

12.     Despite their inability to fix the Defect, Defendants refuse to recall the Vehicles and compensate purchasers because of the financial liability they would

incur in doing so.[2] Instead of compensating purchasers for the Defect, Defendants seek to profit further from it by charging Class Members for the batteries, jumper cables, replacement alternators, and other repairs and services that the Defect necessitates. Defendants have opted to leave tens of thousands of defective Class Vehicles, prone to engine failure, battery failure, and steering drift on the roadways rather than hurt their bottom line.

13.     If Plaintiff and Class Members had known of the Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles or would have paid substantially less for them, as any reasonable consumer would do. Plaintiff and other Class members were denied the benefit of the bargain in connection with their purchases and/or leasing of the Class Vehicles.

14.     The conduct described herein makes Defendants liable for, among other things, breach of express and implied warranties and unfair, deceptive, and fraudulent business practices. In turn, owners and lessees of the Class Vehicles, including Plaintiff, have suffered an ascertainable loss of money, property, and value. The unfair and deceptive business practices committed by Defendants caused

---

[2] TMC's financial disclosures to investors and the SEC contain no fewer than thirty-seven references to the losses and financial harm that TMC incurs when it is required to recall vehicles.

Plaintiff and the members of the Class damages, including, but not limited to, loss of value, loss of use of the vehicles, and battery replacement and other repair costs.

15.    Plaintiff brings this action to redress Defendants' misconduct. Plaintiff seeks recovery of damages and repair under Georgia law and Defendants' express and implied warranties, and reimbursement of all expenses associated with the repair or replacement of the Class Vehicles.

## JURISDICTION AND VENUE

16.    The claims alleged herein arise under Georgia law.

17.    This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) and (6), because: (a) there are 100 or more class members; (b) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs; and (c) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.

18.    This Court has diversity jurisdiction under 28 U.S.C.§ 1332 because there is complete diversity of named Plaintiff and defendants, and the amount in controversy exceeds $ 75,000.

19.    Venue is proper in this judicial district under 28 U.S.C. §1391.

20.    This Court has personal jurisdiction over all Defendants pursuant to O.C.G.A. § 9-10-91 because Plaintiff's claims arise out of Defendants' purposeful

and extensive transactions and business conducted in person and/or through their agents within this judicial district.

## PARTIES

**A.   Plaintiff**

### Nick McClure

21.   Plaintiff McClure is a citizen of Georgia and resides in Acworth, Georgia.

22.   In May 2021, Plaintiff McClure bought a used 2020 Toyota RAV4 from Hennessy Lexus Atlanta, located at 5955 Peachtree Industrial Blvd. in Atlanta, Georgia, for $39,483.74. The vehicle had less than 8,000 miles on the odometer at the time of purchase. Plaintiff McClure has driven the vehicle for personal use only.

23.   Hennessy Lexus Atlanta is part of Toyota's network of authorized dealers across the United States. Toyota features Hennessy Lexus Atlanta on the "Lexus.com" website as an authorized dealer. "Lexus" is a brand that is owned by Defendant TMC. It is also a division of Defendant Toyota Motor Sales, USA, Inc.

24.   Plaintiff McClure extensively researched the Class Vehicles before making his purchase. Plaintiff performed this research from the summer of 2019 until he bought his Class Vehicle in May of 2021. Based on his research, Plaintiff McClure was familiar with Toyota's representations about Toyota's vehicle quality,

safety, and warranties. Plaintiff consulted Defendants' advertising and promotional materials and reviews and other information available on-line. Plaintiff's internet browser displayed Defendants' advertising for the Class Vehicles virtually every time he went online. Plaintiff noted that Defendants' advertising and promotional materials consistently represented the Class Vehicles as safe and reliable.

25.     The advertised safety and reliability of the Class Vehicles were among the principal considerations that led Plaintiff McClure to buy the Class Vehicle from Defendants. Plaintiff viewed many iterations of Defendants' advertising in Georgia that Defendants directed toward Georgia car markets. In advertising that Plaintiff considered and that was typical of Defendants' ads that were displayed to him, Toyota touted the engineering quality of the Class Vehicles and asserted that that the Class Vehicles were "uncompromisingly prepared for [their] role as the ultimate driver companion day in, day out."  Prior to buying his Class Vehicle, Plaintiff McClure also saw stickers placed on the vehicle and interacted with Toyota sales agents at Hennessy Lexus Atlanta.

26.     Toyota's uniform marketing message that its vehicles are safe and dependable was material to his decision to buy his Class Vehicle. When Plaintiff purchased the Vehicle, he believed that, based on Toyota's marketing message, he would be in a safe and dependable vehicle, one that is more dependable than a

vehicle that is not marketed as safe and dependable. At no point before Plaintiff McClure purchased his vehicle did Toyota or any of the other sources that Plaintiff consulted disclose to him that his vehicle was not safe or dependable or that it suffered from the Defect.

27.   At the time of purchasing the Vehicle, and after speaking with salespeople at the dealership, Plaintiff McClure understood that the Vehicle was covered by its original warranty. Plaintiff McClure further understood that the original warranty lasted at least 30,000 miles, that he was buying the Vehicle with approximately 8,000 miles on the odometer, and that the Vehicle was less than three years old.

28.   In January 2022, Plaintiff returned to his Class Vehicle after leaving it parked for about twenty-four hours with all user-operated functions on the Vehicle (headlights, taillights, cabin lights, etc.) turned off. The Vehicle would not start due to its battery having died. This was the original battery that came with the Vehicle when Plaintiff bought it from Hennessy Lexus Atlanta. In order to restart the Vehicle, Plaintiff McClure spent $230 on a replacement battery. Upon resuming his trip home, Plaintiff McClure found that the car drifted off-center even when he held the steering wheel steady, and noticed that this problem worsened at higher speeds. In addition to the Vehicle drifting while the wheel was held steady, the steering

wheel behaved unpredictably—as though the car itself were guiding the wheel, even though no user-controlled assistive steering devices of any kind were turned on. On one occasion, these inputs from the car were so strong that the wheel jerked out Plaintiff's hands while he was directing the car into a traffic circle. In addition, the projection lines that overlay the image displayed on the reverse camera would not show up when Plaintiff put the Vehicle in reverse. The Vehicle had approximately twenty-thousand miles on the odometer at this time.

29.     Directly after experiencing these problems, Plaintiff brought his Class Vehicle to an authorized Toyota dealership and repair center, Cherokee County Toyota, in Canton, Georgia, for repair and inspection. The dealer acknowledged that the steering was malfunctioning in the way Plaintiff described, as alleged; however, the dealer admitted that it could not identify the source of the problem that had caused his battery to drain. Plaintiff brought his Vehicle back to the Cherokee County Toyota repair center two more times over the ensuing weeks. Eventually, the dealership decided that the problems with steering the Vehicle that Plaintiff had experienced were due to a faulty stator in the steering assembly, and replaced the entire steering rack. The dealer/repair center did not claim to have identified the source of, let alone repaired, the battery drain. However, even after the steering rack was replaced, the problems with steering the Vehicle did not go away. Instead,

Plaintiff continued to find that the steering wheel was persistently about 10 degrees off-center to the left while driving.

30.    The next day after the picking up his Class Vehicle from the dealer with the steering rack replaced, the battery on Plaintiff's Class Vehicle died again while Plaintiff was on a local trip. This time, Plaintiff had left the car parked for no more than thirty minutes, with all user-operated functions (headlights, taillights, cabin lights, "accessory" mode, etc.) on the Vehicle turned off. The battery that died on this occasion was the new battery that Plaintiff had recently purchased for $ 230 after the original that came with the Vehicle also died.

31.    Plaintiff returned, for the fourth time, to Cherokee Toyota, where the Vehicle was again tested and evaluated. The dealership reported that they could find nothing wrong with the Vehicle. Instead, the dealership attempted to shift the blame onto Plaintiff, speculating that Plaintiff must have left a user-operated system in the Vehicle running. However, on both occasions when the Vehicle's battery suddenly died, all user-operated systems in the Vehicle were off when Plaintiff left the Vehicle.  The dealership also attempted to blame the steering drift problem on the surface of the road being slanted to the left; however, Plaintiff experienced the problem on all roads, including those where the surface was flat or banked to the right.

32.     Plaintiff then presented the Vehicle to an independent repair center for inspection and repair. The independent repair center inspected the Vehicle and confirmed that it was experiencing a roughly 10 degree drift to the left when the wheel was held steady. The repair center confirmed that the alignment was not the cause of the problem and admitted that they could not find the source of either the battery depletion or of the steering drift.

33.     Plaintiff has incurred more than $ 546 in out-of-pocket expenses, in addition to the cost of gas, on replacement batteries, part and labor, a battery charger, substitute transportation, and other expenses necessitated by the Defect in his Class Vehicle.

34.     Plaintiff McClure purchased his Class Vehicle with the Defect as part of a transaction in which Toyota did not disclose material facts related to the automobile's essential purpose—safe and dependable transportation. None of the advertising and promotional materials and information received from Defendants' dealerships and repair centers has ever disclosed the cause and effects of the Defect. Instead, Defendants have at all times misrepresented and failed to disclose the causes and effects of the Defect, leaving Plaintiff to discover them himself by experiencing the repeated, dangerous malfunctioning of his Class Vehicle. As a consequence of Defendants' misrepresentations, omissions, and active concealment of the Defect,

Plaintiff purchased a Vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a Vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation; it is a literal non-starter. The Defect significantly diminished the value of Plaintiff McClure's Class Vehicle. Had Defendants disclosed the Defect, Plaintiff McClure would not have bought his Class Vehicle, or would have paid less to do so.

**B.**    **Defendants**

35.    Toyota Motor Corporation ("TMC") is a publicly held multinational Japanese corporation headquartered in Toyota City, Aichi Prefecture, Japan.  TMC controls and oversees the design, manufacturing, marketing, and distribution of Toyota and Lexis branded vehicles, including the Class Vehicles, directly and through its operating subsidiaries located worldwide. TMC owns the "Toyota" and "Lexus" brands; it sells luxury vehicles in North America under the "Lexus" brand name. TMC has 208 Japanese subsidiaries and 351 subsidiaries located in other countries, including seven that are incorporated in the United Sates.

36.    TMC began producing the Rav4 in 1994 at plants located in Japan and China. The 2020 Rav4 is the fifth generation of the vehicle. TMC produces and markets the following specifications within the 2020 model year of the "Rav4" brand, collectively referred to as the "Class Vehicles:" LE, LE Hybrid, XLE, XLE

Hybrid, XLE Premium, Adventure, TRD Off-Road, XSE Hybrid, Limited and Limited Hybrid.

37.     TMC designs, manufactures, and tests the Class Vehicles models directly and through its subsidiaries in Japan, Canada, Russia, and China. Based on TMC's representations in its filings with the United States Securities and Exchange Commission, the following facilities that are directly owned and controlled by TMC manufactured, evaluated, and/or performed pre-release testing of the Class Vehicles: Motomachi Production Plant, Takaoka Production Plant, Toyota Technical Center, and Shibetsu Proving Ground.

38.     In addition to the design, manufacture, and testing of the Class Vehicles that TMC undertakes directly, TMC has allocated the design, testing, and manufacturing of the Class Vehicles and their subcomponents in the United States to its United States subsidiary, Defendant Toyota Motor North America, Inc. ("TMNA"), a wholly owned subsidiary of TMC. TMNA is incorporated in California and headquartered in Plano, Texas. According to the "Toyota.com" website, "[s]ince 2017, as part of 'One Toyota' initiative, all operations in North America (R&D, manufacturing, sales, marketing, after sales and corporate functions) are conducted under 'Toyota Motor North America (TMNA).'" Through its research and development division, which has offices in Michigan and a vehicle

testing facility in Gardena, California, TMNA controls and conducts within the United States the design, manufacturing, testing, and evaluation of the Class Vehicles.

39.    TMC coordinates the production, distribution, marketing, testing, and sale of Class Vehicles and their subcomponents across international borders. TMC allocated the production of Plaintiff McClure's Class Vehicle and its subcomponents to its wholly owned subsidiary, Defendant Toyota Motor Manufacturing Canada, Inc., ("TMMC") a Canadian corporation headquartered in Ontario, Canada. TMC caused Plaintiff McClure's Class Vehicle to be manufactured by TMMC. TMMC, under the direction of TMC, manufactured Plaintiff McClure's Class Vehicle. Together with TMNA and TMS, TMC caused Plaintiff McClure's Class Vehicle to be delivered from the TMMC manufacturing facility to a dealership in or near Snellville, Georgia, where it was initially registered on September 15, 2020.

40.    Defendant Toyota Motor Sales, U.S.A., Inc. (TMS), a wholly owned subsidiary of TMC, is incorporated in the State of California and headquartered in Plano, Texas. Together with TMNA, and under the direction and control of TMC, TMS controls the sale, marketing, distribution, and servicing of Toyota vehicles in the United States, including the Class Vehicles. According to the "Toyota.com" website, TMS "supports nearly 1,500 Toyota and Lexus dealerships in the U.S.,

ensuring that the needs of both driver and dealer are accommodated throughout the sales process." Through authorized Toyota and Lexus dealerships, TMS and TMNA together provide and oversee repair services, including product defect testing, pre-release testing, and reporting of such defects to TMC, of vehicles sold and leased by Toyota in the United States, including the Class Vehicles. TMS is represented as the "Warrantor" by the New Vehicle Limited Warranty for the Class Vehicles.

41.    TMC has, and at all relevant times has had, the actual authority to exercise, and in practice exercises, control over TMNA, TMMC, and TMS's work, including but not limited to the design and manufacture of the Class Vehicles, the marketing of all Class Vehicles, the scope of written warranties of all Class Vehicles sold or leased, the scope of repairs in practice to be covered under warranty of all Class Vehicles, and the representations made and facts withheld from consumers and the public about the Parasitic Drain Defect in all Class Vehicles, as evidenced by the following facts, among others:

(a) TMC caused TMNA and TMMC to halt production of the Rav4 models in February 2022 due to supply chain disruptions, and again in March and April 2020 due to the spread of the Coronavirus;

(b) TMC informs its shareholders that it closely controls production of Toyota vehicles at its production facilities, including those operated by TMNA and

20

TMMC, as it "is constantly engaged in upgrading, modernizing, and revamping the operations of its manufacturing facilities based on its market needs and prospects," and "continually reviews and implements appropriate production measures such as revising task time and adjusting days of operation;"

(c) The current President of TMC is the Chairman and CEO of TMNA, and the current Vice Chairman of the TMC Board is the former President of TMNA;

(d) TMC reports revenues earned by TMNA, TMMC, and TMS in its consolidated financial statements filed annually with the U.S. Securities and Exchange Commission ("SEC"). TMC attributed an increase of ¥150 billion in operating income to its marketing operations in North America in 2021. North America is TMC's largest market by vehicle unit sales;

(e) TMC reports to the SEC that its automobiles and auto parts are "sold through. . .dealers such as [TMS], overseas;" and

(f) TMC reports to the SEC and acknowledges to investors that "the cost of customer warranty claims and other customer satisfaction actions," including vehicle repair services provided through Toyota and Lexus dealerships, impact TMC's profitability. On information and belief, TMC does not accept

responsibility for warranty and other repairs without having the contractual right and actual authority to exercise control over the terms of warranties and repair services.

42.    In addition, TMC has held TMNA and TMS out as its agents for all purposes in the United States, but especially for sales, leasing, and marketing of Class Vehicles and for ongoing management of relationships with purchasers and lessees of Class Vehicles, as evidenced by the following facts, among others:

(a) TMC has licensed the "Toyota" brand name and all intellectual property owned by TMC and required for the sale, marketing, distribution, repair, manufacture, and/or design to TMNA, TMMC, and TMS, as necessary for each subsidiary to perform its respective functions on behalf of TMC;

(b) TMC provides marketing and technical materials to TMNA and TMS that use the "Toyota" trademark and TMC-owned trademarks generically, without distinguishing between TMC and its subsidiaries and dealerships;

(c) TMC pays for advertising in the United States and in Georgia that uses "Toyota" and TMC-trademarks generically, without distinguishing between TMC and its subsidiaries and dealerships;

(d) Where TMC does acknowledge a distinction between itself, TMNA, TMMC, and TMS, it represents TMNA and TMS as its presence and

authorized agents in the United States for purposes of designing, manufacturing, selling, leasing, and repairing the Class Vehicles, and TMMC as its presence and authorized agent in Canada for the purpose of manufacturing the Class Vehicles.

43.    TMC, TMNA, TMMC, and TMS jointly supervise, direct, cause, and exercise control over the advertising, promotion, warranting, testing, and/or repair of "Toyota" and "Lexus" brand vehicles.  Subject to the ultimate control of TMC, TMNA and TMS determine the content of all sales materials for Class Vehicles sold or leased in the United States, the content of all warranties, and jointly exercise control, through their authorized dealerships, over the sale, marketing, distribution, and repair of Class Vehicles including, but not limited to, decisions as to whether and under what circumstances to honor express and implied warranties, and regarding the information that is provided to consumers who purchase Class Vehicles from authorized dealerships. TMMC, acting under TMC's direction, caused Plaintiff McClure's Class Vehicle to be shipped to Georgia for sale to Georgia purchasers after TMMC manufactured it.

44.    At all relevant times herein, Toyota authorized dealerships have acted as agents of TMC, TMNA, and TMS. TMC, TMNA, and TMS have the contractual right and have exercised the contractual right to control the marketing, repair,

advertising, sale, and warranting of the Class Vehicles by their authorized dealerships. TMC reports to the SEC that it "maintains networks of dealers" in North America through five regional distributors. TMC, TMNA, and TMS advertise their control over their authorized dealerships on the "Toyota.com" website, claiming that TMS "align[s] sales and marketing resources for our dealers nationwide," and has "strengthened and localized our operations so that we can make decisions closer to our customers and respond faster than ever before." Toyota dealerships act as loan-originators for TMC's consumer financing divisions for loans that meet lending standards established and enforced by TMC, thus ensuring a market for financed purchases of vehicles manufactured by TMC, as well as a lucrative market for TMC in consumer credit.

45.    TMC, TMNA, and TMS hold their authorized dealerships out as their agents for all interactions with consumers, including by providing a directory of authorized dealerships on the "Toyota.com" and "Lexus.com" website, and especially for sales, marketing, and warranting of Class Vehicles, and for management of relationships with purchasers and lessees of Class Vehicles. TMC, TMNA, and TMS authorized and contracted with their dealerships to use the official "Toyota" brand and their trademarks and to sell and make repairs to the Class Vehicles. On information and belief, TMC, TMNA, and TMS establish uniform

policies according to which they control the repair and warranty of Class Vehicles in the United States through their authorized dealerships. TMC informs the SEC and investors that it "generally warrants its products against certain manufacturing and other defects," that its "[p]rovisions for product warranties are provided for specific periods of time" and based on other factors, and lists "accrued warranty costs" among the "risk factors" that may affect TMC's profitability. TMC further reports to the SEC and investors that it accrues costs "to repair or replace parts which might be expected to fail from products safety perspectives or customer satisfaction standpoints." TMC would not accept such liability without having control over the warranty terms and conditions and over extra-warranty repairs.

46.   TMC, TMNA, and TMS provide warranty information, sales information, and vehicle information directly to their dealerships, which pass along this information to prospective purchasers and lessees in the United States. TMC, TMNA, and TMS also control the terms and conditions on which repairs will be made to Class Vehicles by their authorized dealerships. TMC, TMNA, and TMS provide advertising materials to their authorized dealerships, and have the contractual right to control and have exercised control over what materials will and will not be displayed to consumers at these dealerships. TMC, TMNA, and TMS also exercise control over advertising and product information about the Class

Vehicles and repair services offered for the Class Vehicles on the websites of their authorized dealerships.

### *Defendants' Contacts with Georgia*

47.    At all relevant times, Defendants have purposefully availed themselves of the protection of the laws of the State of Georgia and of the market within this State for personal automobiles in general, and in particular, for the 2020 Rav4, as shown by the following facts.

48.    TMC, TMNA, and TMS advertise 44 Lexus and Toyota dealerships on the "Lexus.com" and "Toyota.com" websites in the State of Georgia, and 25 in this District, including the Hennessy Lexus of Atlanta where Plaintiff purchased his Class Vehicle and the Cherokee County Toyota where he presented it for repair.

49.    TMC, TMNA, and TMS authorize and license their dealerships statewide and in this District to use Defendants' intellectual property, including the "Toyota" and "Lexus" brand names, as well as the names of the Class Vehicles and other Toyota and Lexus vehicles that are sold, marketed, leased, and serviced by these dealerships.

50.    TMC, TMNA, and TMS maintain a Lexus Division corporate office in Alpharetta, Georgia, in order to coordinate sales, service, and parts operations and provide training to Lexus dealers.

51.   TMC, TMNA, and TMS maintain a Toyota Financial Services office in Alpharetta, Georgia, to provide financial and insurance products and services to Toyota and Lexus dealers and customers.

52.   TMC, TMNA, and TMS directly or indirectly (according to statistics provided on the Toyota.com website) provide 4,991 jobs in Georgia, which are geared toward promoting the sale of Toyota vehicles in the State.

53.   TMC, TMNA, and TMS have spent $1.48 billion, according to the Toyota.com website, in order to promote the sale and distribution of their Vehicles within the State—nearly 5% of its total reported investment in the United States as a whole.

54.   TMMC manufactured the Class Vehicle with the defective ECMs and related safety components that was ultimately purchased by Plaintiff and, in concert with TMC, TMNA, and TMS, shipped that Vehicle to Georgia to be sold at a Toyota dealership to a Georgia purchaser.

55.   TMC, TMNA, and TMS have purchased television, radio, and internet-based advertising directed toward consumers located in Atlanta and in the State of Georgia to promote sales of their vehicles in general, and of the Class Vehicles in particular, including the advertisements considered and relied upon by Plaintiff in making the decision to buy his Class Vehicle.

27

## BACKGROUND

**A.**   **Toyota Sells the Class Vehicles Based on False Guarantees of Safety and Reliability**

56.    The RAV4 is one of Toyota's highest selling automobile models: in 2020, the RAV4 was the best-selling SUV in the U.S. for 4th consecutive year, with 430,387 vehicles sold that year. The Toyota RAV4 debuted in the United States in 1996, and the 2020 RAV4 is the fifth generation of that model. North America is the strongest market for the RAV4, with more than half a million annual sales in 2019. In 2019, the RAV4 was the world's best-selling SUV, and the fourth best-selling passenger car overall."

57.    In the State of Georgia, Rav4 sales accounted for approximately 13% of all light vehicles sold in 2020. Toyota sold more than 400 Class Vehicles in Georgia in 2020 alone.

58.    Toyota acquired prominence in the automobile industry, and in Georgia in particular, based on its assurances to consumers of "quality, durability, and reliability."[3] Toyota's marketing materials consistently tout Defendants' excellence in design, manufacture, safety, and reliability.

_____

[3] Toyota USA, *2020 RAV4 Overview | Toyota*, YouTube.com (Jul. 2, 2020), *available at* https://www.youtube.com/watch?v=VKNaX8qKejM (*last visited* Feb. 17, 2021); Press Release, *Toyota Celebrates 25 Years of the RAV4 in North America; Introduces New SE Hybrid Grade for 2022*, Toyota.com (Nov. 12, 2021), *available*

59.     Toyota dedicates a page on its website to the topic of "safety," where Toyota represents that it spends "[o]ver $1 million . . . every hour on Research & Development," trumpets its creation of "a consortium of some of the brightest minds in a range of fields working together . . . to think bigger and better about automotive safety," and claims to be "continually searching for ways to make safe vehicles."[4] That page also states that "For us, the journey towards a safe road never ends. This belief, along with our collaborative research efforts, drives us to create advancements and innovations in safety that have helped (and continue to help) . . . protect people."[5] Similarly, on the page of Toyota's website devoted to the company's maintenance and roadside assistance plan, ToyotaCare, Defendants promise "Peace of mind comes standard."[6]

60.     Consistent with its marketing and other public statements, Toyota has represented to the public that the Class Vehicles are safe and reliable and assured

---

*at* https://pressroom.toyota.com/toyota-celebrates-25-years-of-the-rav4-in-north-america-introduces-new-se-hybrid-grade-for-2022/ (*last visited* Feb. 17, 2021) (citing "Toyota's renowned core traits and values of quality, reliability and durability").

[4] Safety, Toyota.com, *available at* https://www.toyota.com/usa/safety/ (*last visited* Feb. 17, 2021).

[5] *Id.*

[6] ToyotaCare, Toyota.com, *available at* https://www.toyota.com/toyota-care/ (*last visited* Feb. 17, 2021).

consumers that they can rely upon the build and quality of the vehicles for daily use.

Below are examples:

- "If you want that all-important combination of safety and reliability, the 2020 Toyota RAV4 has you covered."[7]

- "Safe for every adventure."[8]

- "RAV4 is loaded with advanced safety features."[9]

- "Designed for safety."[10]

- "Durability and reliability are . . . manufactured into every aspect of RAV4 . . . right from where they are assembled and built"[11]

- "Once RAV4 passes the final check it is driven off the assembly line, with some vehicles even heading onto the test track where they undergo noise,

---

[7] *2020 RAV4 vs. Rogue Comparison*, Toyota.com (Jun. 6, 2020), *available at* https://www.toyota.com/rav4/2020/compare/rav4-vs-rogue/ (*last visited* Feb. 17, 2021).

[8] 2020 RAV4 Brochure, *available at* https://cdn.dealereprocess.org/cdn/brochures/toyota/2020-rav4.pdf (*last visited* Feb. 17, 2021).

[9] 2020 RAV4 Overview | Toyota, Jul. 2, 2020, https://www.youtube.com/watch?v=VKNaX8qKejM

[10] 2020 RAV4 Brochure, https://cdn.dealereprocess.org/cdn/brochures/toyota/2020-rav4.pdf

[11] *Toyota RAV4 Specs & Manufacturing Process Overview*, YouTube.com (Dec. 17, 2019), *available at* https://www.youtube.com/watch?v=RBofj17Lb4w (*last visited* Feb. 17, 2021).

vibration, and harshness testing and more driving tests to ensure quality, durability, and reliability, just like all Toyota models."[12]

- "When it's time to get away, RAV4 is ready to help you take on any trip."[13]

- "Once inside, just press the Push Button Start and you're ready to go."[14]

61.     Defendants represent through the websites of their authorized dealers that the typical battery life of the Class Vehicles is 3-5 years.

62.     Plaintiff McClure relied on similar instances of Defendants' uniform advertising message touting the quality and dependability of their vehicles, and of the Class Vehicles in particular, in deciding to buy his Class Vehicle. The above-described representations are similar or identical in content to the advertising and promotional materials that Plaintiff viewed while researching his purchase of the Class Vehicle between the summer of 2019 and May 2021. Plaintiff was exposed to these and similar representations by Defendant virtually every time he opened an internet browser for two years. Since Plaintiff uses an internet browser almost every day, and often multiple times a day, Plaintiff was exposed to Defendants' consistent

---

[12] *Toyota RAV4 Specs & Manufacturing Process Overview*, YouTube.com (Dec. 17, 2019), *available at* https://www.youtube.com/watch?v=RBofj17Lb4w (*last visited* Feb. 17, 2021).

[13] 2020 RAV4 Brochure, *available at* https://cdn.dealereprocess.org/cdn/brochures/toyota/2020-rav4.pdf (*last visited* Feb. 17, 2021).

[14] *Id.*

and unequivocal representations of the Vehicles' safety, at a minimum, on at least seven-hundred discrete occasions. Defendants' consistent, unequivocal, and ubiquitous representations about the safety and reliability of its vehicles in general, and the Class Vehicles in particular, were material to Plaintiff's decision to buy a Class Vehicle.

63.     These representations are false and misleading. None of them discloses that the Parasitic Drain Defect inheres in every one of the Class Vehicles and renders them unsafe, unreliable, and unfit for normal use. As explained in more detail below, the Defect causes the Class Vehicles' batteries to lose charge unexpectedly, long before the expiration of their normal lifecycles. Owners of the Class Vehicles have reported being unable to start their Vehicles within hours of their last use of the Vehicle and when their Vehicles were left with all of their user-controlled systems (headlights, taillights, cabin lights, etc.) turned off. Many owners of Class Vehicles have been left stranded when this issue manifested and have had to pay for their Vehicles to be towed to a garage and have their batteries recharged or replaced, well before the expiration of the normal battery lifecycle. Owners also report that the Defect has caused electrical issues that impacted the safety of their Vehicles in other ways, like causing the vehicle to significantly drift or pull while driving. As alleged, Plaintiff has experienced these effects of the Defect in his Class Vehicle. These

issues are directly attributable to the Defect's impact on the battery and electrical components of the Class Vehicles.

**B.**     **The Parasitic Drain Defect Creates an Unreasonable Risk of Battery Failure and Electrical System Malfunction That Renders the Class Vehicles Unsafe and Unfit for Ordinary Use**

64.     Contemporary consumer automobiles are complex devices that rely on an extended electrical system to enable their most basic functions; they now function more like computers than simple gas-and-pedal machines.  Like most contemporary automobiles, the Class Vehicles require electricity to fulfill their intended purpose of reliably and safely transporting consumers where they need to go. The core elements of the Class Vehicles' electrical system consist of a battery, an alternator, and electrical components, called electronic control modules or "ECMs," that coordinate and store information about the Vehicle's operating systems.

65.     When a Class Vehicle's engine is off, the battery is the Vehicle's only source of power. The engine requires electrical input from the battery to start running. In addition to enabling the engine to start when the ignition is turned, the battery continues to supply power to various components of the Vehicle while the engine is off. State and federal laws require automobile manufacturers to include safety features "to reduce traffic accidents and deaths and injuries resulting from

traffic accidents,"[15] such as headlights, taillights, and hazard lights. These mandatory safety features, as well as other safety components such as defrosters, door locks, alarm systems, interior lights, and windshield wipers, all rely on battery power, exclusively when the engine is not running, and in addition to power from the alternator when the car is turned on. A drained battery can cause these safety features of the Class Vehicles to fail or malfunction, both when the engine is turned off and while it is running.

66.     In addition to these user-controlled safety features, Class Vehicles are equipped with a number of electrical subsystems that draw electricity from battery while the engine is off. These subsystems require electricity from the battery to store information that facilitates the operation of the Vehicle or to remain in a "readiness" condition, so that they will turn on promptly with the engine is started. For example, the Vehicles' steering system requires electricity from the battery in order to store information about the center point of the Vehicle's steering wheel. When that system loses electric charge—as will happen when the battery is depleted—the power steering system must be recalibrated to prevent the Vehicle from "drifting" off-center when the wheel is held in a centered position. Other

---

[15] 49 C.F.R. § 571.108.

components of the Class Vehicles that continue to draw power from the battery while the engine is off include: the engine control module, powertrain control module, transmission control module, brake control module, central control module, central timing module, general electronic module, body control module, and the suspension control module.

67.    The flow of electricity from the battery to each of these subsystems is regulated by Electronic Control Modules ("ECMs"). ECMs are subsystem components responsible for controlling the rate at which the Vehicle subsystem they govern will drain the battery. ECMs also regulate the consumption of electricity by user-controlled features of the Class Vehicles, such as the clock and the radio. In addition, ECMs store important data like engine diagnostic codes and fuel economy adjustments.



Figure 1: A typical ECM

68.     ECMs are designed to work together, and are referred to collectively as the vehicle's "computer." In a vehicle that is free of defects, the ECMs operate in tandem with each other to coordinate the vehicles' electrical systems and to regulate the flow of energy from the battery. If the ECMs are improperly designed, manufactured, or installed in a vehicle, they and the subsystems they govern will cause "parasitic drain," meaning that they will draw upon the battery at an excessive rate, causing the battery to lose charge prematurely and one or more of the systems that depend on the battery to fail. In addition to the ECMs, faulty wiring, poor installation, and defective fuses within the vehicle's electrical subsystems also cause or contribute to parasitic drain. All are defects introduced by the designer and/or manufacturer.

69.     Defendants have uniformly designed and/or manufactured the Class Vehicles with ECMs and associated electrical subsystems that cause parasitic drain in the Class Vehicles (the "Parasitic Drain Defect"). These defective components were designed, installed, and/or manufactured by Defendants, and were present in the Class Vehicles at the time of sale.

70.     The Parasitic Drain Defect causes a number of problems for the operation of the Class Vehicle. Class Vehicles require a sufficiently charged battery to start their engines; specifically, they require enough charge to enable the

sparkplugs and starter to initiate the engine. While a Class Vehicle's engine is running, the alternator supplies power to the electrical components and charges the battery to a specified voltage level. However, the alternator cannot generate power or charge the battery with the engine off. Thus, when the battery charge is reduced by parasitic drain, the battery will not have enough charge to start the engine, and the Class Vehicle will not turn on without assistance from an exogenous source of electricity.

71.     The Parasitic Drain Defect damages the Class Vehicles. Class Vehicles' batteries work in tandem with their alternators to regulate voltage in the electrical system to avoid power surges that can damage the Vehicles' electrical components. When parasitic drain decreases the battery charge, the battery cannot assist the alternator in regulating energy flows to the Vehicle's electrical components, which causes damage to those electrical components in the event of a power surge.

72.     The Parasitic Drain Defect also contributes to premature battery expiration. TMC, TMNA, and TMS advertise that the Class Vehicles typically maintain a battery life of 3-5 years. However, due to the Parasitic Drain Defect, a Class Vehicle's battery is put under continuous strain, causing the battery to expire before the end of its normal lifecycle. This happens because batteries have the capacity to run through a limited number of "duty cycles"—*i.e.*, the cycle of

discharging and recharging a battery—before they become unable to store the amount of electricity required to power the car. With each depletion, the battery becomes weaker and loses some of its storage capacity. This reduced capacity is irreversible, and no amount of jump-starts or recharging through the alternator will restore it. Parasitic drain causes batteries to deplete more quickly, and thus to run through the total number of "duty cycles" in a shorter period of time than they would if they were not exposed to parasitic drain.

73.     The Parasitic Drain Defect also undermines the performance of the Class Vehicles while they are running, including in ways that pose major safety risks. Prior to the complete failure of a battery, parasitic drain causes key safety components (*e.g.*, hazard lights, headlights, and taillights) to fail, even when the Vehicle is being driven. As the battery degrades, the dashboard, headlights, and hazard lights flicker and dim due to poor electricity flow coming from the battery and/or alternator. Plaintiff McClure experienced these issues with his Class Vehicle in January 2021.

74.     The Parasitic Drain Defect also damages the alternator of the affected vehicle. An alternator is a vehicle component that is usually mounted to the front of the engine and has a belt running around it. Its function is to distribute electricity to the car and recharge the battery while the car is running. When parasitic drain

depletes a battery, the alternator must work to replenish the battery's power at a higher-than-usual rate. This results in strain on the alternator's internal electrical components, its belt, and its bearings. When that occurs, the alternator's ability to generate power degrades until the point of failure. As the alternator's ability to generate power degrades, there is an increasing risk that the vehicle's engine will stall while in operation. Toyota dealerships typically charge around $800 to replace the alternator on a Class Vehicle.  The cost to replace a vehicle battery typically ranges from $200 to $250.

75.     The Parasitic Drain Defect causes important ECMs to lose power, which, in turn, causes the affected ECM to lose stored data.  In the case of the engine control module, for example, the loss of stored data due to battery depletion degrades engine performance, reduces fuel economy, and increases emissions. In the case of the ECMs associated with the Class Vehicle's power steering system, the loss of power to the ECMs causes those ECMs to lose stored data concerning the steering wheel's centerpoint, which causes the Class Vehicles to drift out of the lanes while the wheel is held steady.

76.     The Parasitic Drain Defect creates significant potential safety risks for drivers, passengers, and other vehicles and pedestrians. Battery depletion at a higher than normal rate can cause drivers and pedestrians to become stranded in remote

locations where they have little to no access to repair and rescue services. Accelerated battery depletion can cause the headlights, taillights, hazard lights, interior cabin light, and other safety systems on the vehicle to fail. It can also cause the engine to stall while the vehicle is in operation by putting excessive strain on the alternator, which can prevent the vehicle from moving forward to avoid being rammed from behind or obstructing traffic. Parasitic drain even affects the driver's ability to steer their Class Vehicle while it is in operation, as evidenced by Plaintiff's experience.

77.    In a document filed by Defendants with the National Highway Transportation Safety Administration ("NHTSA"), Defendants admit that battery depletion causes the steering system on a Class Vehicle to lose calibration, which causes the steering wheel to pull or drift to one side while driving. This means that a driver operating the vehicle must constantly adjust the steering wheel off-center to keep the car from changing lanes or driving off the road.

78.    As detailed below, Toyota knew about the Defect, its underlying cause, and the symptoms associated with it since before January 2019, before any Class Vehicles were sold. Nevertheless, Toyota has at all relevant times failed to disclose and affirmatively concealed this defect in its marketing materials and other communications addressed to vehicle customers and owners.

**C.**   **Toyota Knew or Should Have Known that the Class Vehicles Suffered from the Defect Before Selling the Class Vehicles**

79.     Defendants knew about the Defect through their exclusive knowledge of non-public, internal data about the Defect, including: (1) pre-release testing data; (2) their own records of customers' complaints about the Defect to Defendants' dealers for vehicle repairs; (3) aggregate data from Defendants' dealers, including their repair records and orders; (4) consumer complaints to the NHTSA and resulting notice from the NHTSA; (5) warranty and post-warranty claims; (6) testing conducted in response to owner or lessee complaints; and (7) other internal sources of aggregate information about the problem. Additionally, Defendants were aware of the Defect because of the large number of public complaints about the battery drain experienced by the Class Vehicles. Even before commencing sales, Defendants were well aware of the Defect but failed to notify their customers of the nature and extent of the problems with Class Vehicles or provide any adequate remedy for the Defect.

80.     Defendants are experienced in the design and manufacture of consumer automobiles and understand that well-functioning electrical systems are essential to the reliability, safety, and durability of their vehicles. Toyota subjects new and redesigned models to long-distance durability testing to verify that there are no quality issues before beginning mass production. Toyota performs pre-release

testing of all aspects of its vehicles, including their electrical systems, at facilities including, without limitation, the Toyota Technical Center and the Shibetsu Proving Ground, which are owned and operated directly by TMC, and at testing facilities located in the United States that are operated by TMNA subject to TMC's direction, including, without limitation, its research and development division, which is headquartered in Michigan and maintains a campus for vehicle evaluation in Gardena, California.

81.    As an experienced manufacturer, Defendants conduct extensive testing, including pre-sale testing for parasitic drain, to verify that the electrical system is free from defects and meets Defendants' specifications. Defendants' pre-release testing includes "Failure Mode and Effects Analysis" ("FMEA"), which is a methodology for testing automobiles for defects and isolating the causes of such defects prior to their marketing, and distribution that was adopted in the automobile industry in the 1970s. TMC has developed its own, enhanced version of the FMEA methodology, which Defendants apply to their vehicle models prior to marketing and distribution.

82.    The specific purpose of FMEA testing, including the testing that Defendants applied to the Class Vehicles, is to localize the source of defects that manifest diffusely. Defendants' application of FMEA testing was, therefore,

perfectly suited to identifying the source of the Parasitic Drain Defect in the Vehicles' ECMs and/or associated electrical subsystems. By performing testing according to its own FMEA methodologies, Defendants were able to identify and localize the causes of the parasitic drain defect.

83.     In promotional materials produced by TMS and maintained on-line on TMS's You Tube channel, an engineer employed by TMNA explains that "we rigorously test our electronics. We test both at a part and a vehicle level. And we test in a lab or a chamber and the road." With respect to the RAV4, each vehicle is subject to a number of quality checks during the manufacturing process. According to promotional materials produced by Toyota and 2019 and maintained on-line, Toyota claims that once a RAV4 passes the "final check [it] is driven off the assembly line with some vehicles even heading onto the test track where they undergo noise, vibration, and harshness testing, and more driving tests to ensure quality, durability, and reliability, just like all Toyota models."

84.     Defendant's pre-release testing was substantially certain to detect the Defect. The Defect manifests quickly, within months, if not days, of Class Members' beginning to attempt to use the Vehicle. The Defect can be detected by measuring the rate of electrical drainage from the battery, which is a commonly tested feature of modern automobiles and is easily detectible by a manufacturer.

85.    Defendants started selling the Class Vehicles through their dealership in Georgia and elsewhere in the fall of 2019. Defendants' communications with their dealers confirm that Defendants knew the Defect existed in the Class Vehicles before commencing sales. In a Technical Service Bulletin ("TSB") issued by Defendants in January 7, 2019, and applying to the Class Vehicles (specifically to their pre-delivery service), Defendants explained that "[a] battery in a stored vehicle is subject to conditions that can reduce its performance and life. These conditions include storage period, temperature, parasitic drain, and battery load. Because of these factors, battery inspection and maintenance are required in order to ensure proper operation and optimal battery life."  This bulletin established a battery inspection procedure for Defendants' network of dealers: "ALL vehicles MUST be inspected according to the procedures listed below using the digital battery system analyzer no more than 48 hours prior to customer vehicle delivery."[16] "To reduce parasitic battery drain on vehicles in storage for 1 week or more, the negative (–) battery cable should ALWAYS be disconnected to reduce battery discharge. When the negative (–) battery cable is reconnected, check and reset electrical components, such as the clock, radio, etc., and re-initialize ALL applicable systems/functions."

---

[16] *Id*. at 2.

86.    The TSB confirms that Defendants were aware that the Class Vehicles had a problem with parasitic drain as early as January 2019, and that the problem was serious enough to require (a) battery inspection and maintenance by the dealer, (b) specific testing for battery health within two days of delivering the Class Vehicle to a consumer, (c) that the Class Vehicles' batteries needed to be disconnected if they would remain in storage for a little as one week, and (d) that a variety of "applicable systems/functions" in the Class Vehicles would be disabled or impaired by being disconnected from a battery charge, as would happen in cases where the battery is depleted by parasitic drain. However, instead of notifying dealers of the existence of the Defect and its causes and effects and instructing them to warn consumers about it, or better, warning consumers themselves, Defendants did the opposite: they instructed their dealers to take additional steps to conceal the Defect, including ongoing battery inspection and maintenance, in addition to testing the battery as little as two days before delivering the Vehicle to purchasers or lessees. The TSB reveals that Defendants were fully aware that the battery could fail in as little as *two days*, as consumers were soon to find out, due to the Parasitic Drain Defect.

87.    The apparent purpose of these measures by Defendants is to boost sales of the defective Class Vehicles by instructing their dealerships to ensure that the

Vehicles' batteries appear to be in working order immediately before delivering the Class Vehicles to lessees and purchasers, knowing that, because of the Defect, that batteries will likely fail soon after delivery. Rather than warn consumers or recall the Vehicles, Defendants decided to conceal the Defect, and took consumers' money for the purchase or lease while leaving consumers to deal with the undisclosed consequences of the Defect post-sale.

88.    In addition to Defendants' knowledge of the Defect arising from testing the Class Vehicles, Defendants learned of the Defect from customer complaints soon after the Class Vehicles were first offered for sale.

**D.    Customer Complaints Made Toyota Aware of the Defect in the Class Vehicles**

89.    Consumer complaints to the NHTSA and various consumer websites and message boards dedicated to the Class Vehicles also establish that Defendants were aware of the Defect but chose to conceal its existence.

90.    The Office of Defects Investigation within the NHTSA conducts defect investigations and administers safety recalls.  All vehicle manufacturers, including Defendants, are legally obligated to monitor and analyze NHTSA complaints to determine whether vehicles or automotive components should be recalled due to safety concerns (which is backed by criminal penalties). *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000). In compliance with this legal requirement,

Defendants monitor and review NHTSA complaints, and are therefore aware of the information contained in them.

91.    As shown below, numerous complaints filed by Class Vehicle owners with the NHTSA establish that Toyota knew, or should have known, of the Defect at least as early as June 2020 (NHTSA ID No. 11331313), based solely on NHTSA complaints.

- NHTSA ID No. 11331313 (dated June 28, 2020) ("New vehicle, parked in enclosed garage, at home for thirty-six (36) hours. **Vehicle had approximately six-hundred (600) miles**. Wife made attempt to start the vehicle but the battery was dead. No lights, no horn functioning. **Called toyotacare for assistance**.. They responded and determined the new battery had five (5) volts. This was described as a totally dead battery. **I took the vehicle back to the dealership**, toyota of olympia (washington) replaced the dead battery and installed a battery trickle charger. The next day, we drove the vehicle for at least five hours and parked in closed garage. Battery voltage was 12.67 volts. After three hours, parked, the battery was 12.69. The next morning at 6am the battery was 12.63. Within three hours (9am) the battery was 12.45 volts. Any battery at 12.45 volts is considered a dead battery. Within twelve hours the battery diminished from fully charged to dead . . . .") (emphasis added).

- NHTSA ID No. 11340023 (dated July 17, 2020) ("2020 january rav4 xle awd. 2 cases of dead battery. 1st in april mileage 2029, 1 week without driving. 2nd in july milage 2896, 2 days without driving. 1st time; aaa jumped it, tested battery said it failed. **Took to dealer**; nothing wrong, battery test good. 2nd time; toyota road server jumped it. A simple search of the web shows hundreds of the same issue. . . . **This is huge safety issue!!! People are being stranded at any time with a dead battery on cars less than a year old!!!**") (emphasis added).

- NHTSA ID No. 11352652 (dated September 1, 2020) ("**I have a 2020 rav4 xle with about 3,000 mileage. The car battery has died twice.** The

first time it happened, i jump started the car. The second time, **i took the car to the dealer** but they said there was nothing wrong with the car. I don't understand why a new car would be having these battery problems. . . . ") (emphasis added).

- NHTSA ID No. 11374314 (dated November 12, 2020) ("**Car has approx 900 miles and has been to the dealer 3 times and jump started 3 times**. Toyota svc dept is unable to reproduce or identify the problem, **i was told i'm not driving the car enough and that they can't fix a problem when they don't know what it is, i never know when the car will start or not, very frustrating**.") (emphasis added).

- NHTSA ID No. 11385068 (dated December 26, 2020) ("**Car battery completely drained after not being driven for 24 hours leaving me stranded**. Car would not start and had to be jump started. There is an electrical issue causing quick and significant battery drain. Car was purchased in september 2020 and has less than 10,000 miles.") (emphasis added).

- NHTSA ID No. 11389797 (dated January 25, 2021) ("Vehicle parked for less than 24 hrs. 14 months old, approx 12,000mi. **Battery totally drained. Left stranded without vehicle use**. Indicates smart key problem, tried other keys. Battery is totally drained.") (emphasis added).

- NHTSA ID No. 11399439 (dated March 5, 2021) ("2020 RAV4 hybrid: battery keeps dying. Purchased 6/22/20, battery died multiple times 3 weeks later, **battery replaced 7/16/20. Battery dying again 2/19/21 and again 3/5/21. Ongoing issue**.") (emphasis added).

- NHTSA ID No. 11426967 (dated July 29, 2021) ("Car sat for 4 days while we here hiking. Battery went dead. We were 15 miles up a gravel road and thankfully someone came by who had jumper cables. **Reported issue to Toyota today and will take to dealer**. Apparently, Toyota has no current fix for the battery drain when vehicle is off. Searched online and found 100s of reports of this same issue from 2019, 2020 rav4 owners, both hybrid and non-hybrid.") (emphasis added).

92.    In addition to the numerous complaints lodged with the NHTSA, consumers have discussed the Defect on various consumer websites and message boards dedicated to the Class Vehicles. Defendants monitor the information posted on message boards and websites that are dedicated to the vehicles they sell, including the Class Vehicles. Defendants have explained in promotional materials available on-line that they seek out feedback from their customer relations department, observe customer engagement with social media channels, and "closely monitor customer opinions gathered by third parties such as newspapers, magazines and on-line publications, and the leading independent satisfaction surveys, such as those conducted internationally." Moreover, due to the sheer volume of complaints on consumer websites and message boards regarding the Defect—the earliest of which began appearing no later than January 1, 2020—Defendants were aware that the Class Vehicles suffered from the Defect.

93.    For example, there are numerous complaints on a forum devoted to the Class Vehicles, Rav4World:

**Posted by berniekk on January 1, 2020:**

Just purchased a 2020 rav4 xle premium first of December, first problem, leaving to go to work 5:30 am. no start had a dead battery, I jumped started and about 30 seconds after crank up the engine started to make a rattling and knocking sound so I immediately shut the engine off, and called **Toyota road service to haul to the dealer** ( 37 miles away ) the rav4 has 1,273 miles on it when this happened.

The service department had the car for 2.5 hours and could not find any problem, the service tech said the rattling and knocking was the high pressure fuel pump and that was normal, the tech said they charged the battery and did not know why it went dead.

….

[T]he service manager had everything the tech did typed up under warranty work, charge and test the battery, but did not do a parasitic draw test to find what is draining the battery. Been checking the battery voltage off and on today and the voltage is dropping, it has dropped almost one volt ( using analog meter ) scents this morning.

**Posted by DLinzy on January 13, 2020:**

Experienced the dead battery this morning, **1906 miles, in warm garage, nothing left on**.

**Posted by sound4r on February 6, 2020:**

I went out of town for a four day trip in the mountains and on the second day woke up to a dead battery. We went out for a couple hour drive then back. We weren't camping but were at a cabin, so we weren't draining the battery in the car, charging devices, music, etc. For the life of me I can't figure out what happened. Maybe a door left ajar and lights on inside or something is what I guess. I was a bit concerned every time I went to start it up to go somewhere, but didn't face that issue again or since then

I don't usually carry jumper cables, but I over packed and jumper cables was something I decided to bring just in case and just put them with the spare tire. It was a pain to find someone to jump me because there weren't many people around. Still not sure what happened, but I decided to leave the jumper cables in the car as a safety measure. **I also went in for my 5k service when I got back and they couldn't find anything**.

**Posted by aandkorfc on February 8, 2020:**

I have a 2020 LE and have the same problem. I bought it at the end of Dec and I had to have it jumped 3 weeks later with 800 miles on it. **I brought it to the dealer and they said they couldn't find anything wrong.** The

dealer said they did a parasitic drain test, tested the alternator and recharged the battery. I was in and out in 30 minutes so I was suspicious.

I brought it to another mechanic and they said the battery couldn't hold a charge and that it had a dead cell in it. So I had the battery replaced. Now today I had to have it jumped again, so clearly more than just the battery is the issue. **I brought it to the dealer and they looked at it for over 2 hours this time**. They still can't find anything wrong. They said that they can tell something is not right by working on it but they can't tell what it is. So they are having me drop it off in a couple of days for them to keep it and run more tests.

Not what I was hoping for in a new car. It worries me since I sometimes need to leave it at an airport for a week or two for work. Not sure how I'm going to deal with that the next time I need to travel.

**Posted by gulagula on February 10, 2020:**

I have a 2020 XLE Premium with 3K miles and after not driving the car for 3 days had the same problem; car wouldn't start the morning of the 4th day. I jump started the car and **took it the dealer. They also tested the battery, looked for a drain, etc. with no culprit found**.

94.     Almost identical complaints proliferated on the popular website Reddit, in the Rav4Club forum. Below are a sample of those complaints in the spring and summer of 2020:

**Posted by CatManDeke on April 3, 2020:**

- So my 2020 Rav4 is only 4 months old...I went to start my car and it didn't start. I charged the battery and now it starts. My car only sat for 4 days unused and there were no lights left on, even though the lights should shut off automatically. Has anyone else had this happen? Seems very weird for a new car to have its battery die so quickly.

**Posted by Luna88SDM on April 3, 2020**:

- Mine has done it twice in the few months I've owned mine. Also from what I experienced the battery locks up like it is dead but when I jump it the engine is already on. I also got a parking assistance unavailable and smart key malfunction error when mine did this Have Toyota document it. **My dealership did a full system check said everything looked perfect** but noted that I brought it in for that issue.

**Posted by Mjkenn3 on August 26, 2020:**

- Got mind 2 months ago, 1,500 miles right now. It was dead in my garage 2 days ago.... **I brought it in and they told me sometimes sensors run in the background and can drain the battery.. then told me, "Toyota recommends driving the car every day or 2" and I just about lost it**. They kept the car, called me after they checked the battery and said it checked out.... So according to them there is nothing wrong with my car that died in the driveway with only 1,500 miles on it.

**Posted by LegMD on August 17, 2020:**

- This seems to be a recurrent thing. Today August 17th 2020 10am. it happened to me too. Is not turning on. It definitely seems to be the battery. Will try jump start it. If it works will disable the automatic brake as suggested. Hopefully that is what it is will update post. BTW mine is not hybrid, it is 3 months old and low mileage less than 2000.

**Posted by blinky_brendan on June 5, 2020:**

My wife and I bought a new LE 2.5 weeks ago and the battery has died twice. Yesterday it died late in the day after she drove it earlier in the morning.

**Posted by phud418 on June 17, 2020:**

- Same thing happened to me today. 2020 Rav4 Hybrid with less than 2k miles. Completely dead battery and NOT due to leaving the lights on, etc**. I called Toyota Roadside Assistance and the guy said he jumps 2020 Rav4's 3 - 4 times a week.** Toyota needs to do something about this!

**Posted by DeGrandeT on June 20, 2020:**

- Adding to the noise. We've had our 2020 Rav4 limited hybrid less than two weeks with less than 100 miles. We didn't drive it for four days and found the battery died. **Toyota service came to jump** - similar to other expierences on this thread, **the servicemen said he's jumped 20+ rav4's in the last few weeks and heard about 15 people returned them back to Toyota**.

   **Posted by knesbiitt1141 on June 22, 2020:**

- Just bought my 2020 rav4 a month ago. Only has 450 miles on it. Went to start the car this morning and it was completely dead.

   **Posted by mbmoma10 on June 23, 2020:**

- This happened to me 3 days ago. I have a 2020 Rav4 XSE Hybrid with 4200 miles on it. No problems at all. Drive it every day and 3 days ago go out in the morning and it was dead. Wouldn't start. **Dealership came out and jumped it for** me (I didn't have another vehicle or battery jump start). **They took it in and said I had a Damaged Cell in the Battery. And replaced the Battery**.

   **Posted by Ok_Cookie4730 on June 23, 2020:**

- This just happened to mine 4 days ago. It's a 2020 xle with 2212 miles, I just bought it in February. This is the first problem I've had with it. I have the red light engine shut off feature on all the time. I noticed the time I drove it before it died that instead of the engine shut off timer coming up it said "Battery Charging" I thought it was wierd but I didn't think that meant the battery was going to die. I didn't drive it one day after that, then on Weds morning I was trying to leave for work and it was completely dead battery. I called roadside asst to jump it then I went straight to the dealer. **I told the Toyota guy about the "battery charging" but he didn't have any explanation**. I left my rav4 there and the battery failed the load test so it was replaced but now two days later the same "battery charging " notice came up again, so I'm just waiting for it to die again! I'll turn off the parking brake and engine shut off, hopefully that helps. I got a new car so I can depend on it not to leave me stranded and just my luck that this happened.

**Posted by asian-_-maniac on July 28, 2020:**

- Bought my 2020 rav4 xse hybrid and had it sit in my drive through for only a day only to have it not start the next day. It had 26 miles brand new...

**Posted by sbbordelon on August 13, 2020:**

- My 2020 Rav4 Limited left me stranded with a dead battery yesterday. I have had the vehicle a total of two months with 2,000 miles on it. I got a jump and **took it to the dealership to have the battery checked out. I was told it tested okay!** Got my fingers-crossed.

95.     The same complaints appeared on ToyotaNation.com, a forum devoted to Toyota vehicles. Below are a sample of those complaints in mid-2020:

**Posted by BoloMK34 on Jun 7, 2020:**

- I took delivery of my wife's RAV4 XLE AWD in late December and yesterday (June 6, 2020) we had the battery replaced by the dealer. OK, Lemme back up some.

    A couple of months ago we found the battery was dead...thinking that we didn't close a door or something else we did, **I called Toyota Care** and they sent out somebody to jump the car and everything was fine...until...

    Friday AM my wife was about to run some errands and...the battery was dead. **I called Toyota Care again**, they sent somebody out, jumped the battery and it worked just fine...or so it seemed. We ran the car for 30 minutes or so in the garage and turned off the car. I called the dealer (Thousand Oaks Toyota) and made an early AM appointment as this should NOT be happening.

    I was about to take the car to the dealer yesterday and...DEAD BATTERY! **Called Toyota Care again and this time asked for a flatbed for a tow to the dealer**...sure thing! (There's a tale of pain and woe here that I won't go into as this thread is supposed to be about the battery.) I eventually gave up on the tow service and jumped the car myself with my 2018 Camry and it started right up...left the car running, rushed to the dealer...

OK, the Service Writer (whom I have no reason not to trust) listened to my tale and asked we NOT turn off the car. He said that they've seen a few of these and it's almost certainly the battery. Yeah... He would not elaborate any but I got one of those "knowing looks" like...the factory battery is crap.

**Posted by Kady on Jun 17, 2020:**

- Add me to the list of people with a 2020 RAV4 Limited Hybrid and a dead 12V battery twice in 6 months. Built in Canada, purchased in December 2019, first dead battery incident just 2 weeks later, then a second incident 6 months later. **Had the car towed to the dealer the first time, then jumpstarted by ToyotaCare and driven to the dealer the second time. Like others, the dealer cannot find a reason for the drained 12V battery.** All the possible causes mentioned by others did not include the stop start system and how much that drains the battery. Since I have a short daily commute, plus home confinement over the past 3 months, that's my main suspicion at this time that the 12V battery is not adequately recharged and eventually drains.

**Posted by Vicki S on Jul 1, 2020:**

- Same thing. My 2020 Hybrid XSE was DOA on Sunday Jun 28th. Wanted it towed, but the AAA guy (I had forgotten about Toyota Care) was afraid to put it on the flatbed since it was stuck in park. Anyway, he jumped it and **I drove it to the dealer**. They were closed so I left it front and center in front of the service bay. The next morning, it wouldn't start for them either. They jumped it and drove it around, then parked it for a few hours. Started up for them. Put it on a load test, fine. I picked it up yesterday afternoon and no problems since. I fully expect this to be an ongoing problem. **The service guy can't say anything, I know that. But he said enough that I am confident they are aware of this.**

**Posted by BENLIN16 on Jul 4, 2020:**

- Same problem for my new 2020 Rav4 LE, 1300 miles 3 months old, battery got drained out 3 time in the past 3 weeks. **Took it to the dealer, left the car overnight, then they found out the same problem next morning - car can't start up.** They said there's a sensor problem and they have to order the park for me, asking me to leave my car there for 3 days,

then said the part wouldn't arrive in 7 days so I had to go to the dealer to pick up my car, they will call me once the part arrives. I have never had any of problem in any of the new cars I owned in the past 25 years, I don't know what is going on with the new Rav4, and don't know why Toyota hasn't recalled it.

**Posted by anry555 on Jul 18, 2020:**

- Same thing happened to my RAV4 hybrid limited 2020 today. Funny enough i had my first service 2 days ago and all were fine.

  The towing guy jumped it and **i drove it to the dealership. They couldn't find anything as all tests passed.**

  now as i'm leaving for 400km trip, I'll be caring the jump cables with me.

96.    The quantity and frequency of complaints related to the Defect in the Class Vehicles—as well as the relatively uniform nature of the problems described—indicates that Defendants knew or should have known about the Defect and should have informed purchasers about it.

## E.    Defendants and Their Agents Received Numerous Complaints and Other Notice of the Defect

97.    The complaints detailed above describe numerous encounters between Defendants, their dealers, and agents, and owners and lessees of the Class Vehicles seeking repair or replacement of their batteries due to the Defect. As early as January 2020, when consumer complaints began appearing on discussion forums devoted to the Class Vehicles that Defendants monitor, and no later than June 2020, when complaints began to be submitted to NHTSA—which Defendants are legally

*required* to monitor—Defendants knew that the Class Vehicles suffered from the Defect. Defendants also were put on notice of the Defect from the sheer number of reports received from dealerships and ToyotaCare, Defendants' customer relations department, which interacts with individual dealerships to identify potential common defects. ToyotaCare has received numerous reports regarding the Defect. Defendants' customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data. Based on these encounters and the resulting complaints, repair orders, and attempted warranty claims, Defendants knew or should have known of the Defect.

98.    According to Defendants' marketing materials made available through their website, Defendants possess a worldwide network of customer quality offices, including a "FULL Customer Quality Engineering" office in North America. Defendants on-line marketing materials claim that "[o]ur quality offices around the world check on our performance and seek ways of doing things better. Our 'customer first' philosophy is a part of Toyota DNA and means we always listen to what our customers have to say and use their opinions and experiences to make improvements." Defendants' on-line marketing materials claim to

have designed a step-by-step method to ensure any problems with our vehicles are identified and remedied as quickly and thoroughly as possible. Called Early Detection and Early Resolution, it is our global process for checking, assessing and rectifying any problem reported by a customer. The information and details of any remedial actions are shared, so that any recurrence can be prevented, or promptly rectified. Our EDER mission is to minimise customer inconvenience, while solving any problem within the shortest lead time and taking action to prevent an issue from spreading further or becoming more serious.

99.    Defendants' marketing materials claim that their quality assurance program includes "[c]onfirmation 48 [hours] after dealer report for safety related issues," and that "100% of the reports from customers are analysed." These claims are either false or misleading or are evidence that Toyota knew of the Defect and failed to solve it.

100.    Defendants routinely monitor part sales reports and are responsible for shipping parts requested by dealerships and technicians. On information and belief, all Toyota service centers are required to order replacement parts, including batteries, directly from Defendants. Other independent vehicle repair shops that service Class Vehicles also order replacement parts directly from Defendants. Thus, Defendants have detailed, accurate, and real-time data regarding the number and frequency of replacement part orders. The increase in orders of batteries and other auto-parts necessary to fix damage caused by the Defect to the Class Vehicles was

known to Defendants and should have alerted them to the scope and severity of the Defect.

101.   Defendants' warranty department similarly analyzes and collects data submitted by their dealerships to identify warranty trends in their vehicles. On information and belief, it is Defendants' policy that when a repair is made in connection with a warranty claim (whether successful or not), the dealership must provide Defendants with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed repair information to Defendants, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.

102.   Defendants had superior and exclusive knowledge of the Defect and knew or should have known that the Defect was not known or reasonably discoverable by Plaintiff and Class members before they purchased or leased the Class Vehicles.

103.   The existence of the Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiff and other Class members known of the Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them at all.

104.   Reasonable consumers, like Plaintiff, expect that a vehicle's battery and electrical system will function in a manner that will not pose a safety risk, be free from defects, and not impair the usage of the Class Vehicles for their intended purpose. Plaintiff and Class members further reasonably expect that Defendants will not sell or lease vehicles with known safety defects, such as the Defect, and will disclose any such defects to their consumers when they learn of them. Plaintiff and Class members did not expect Defendants to conceal and fail to disclose the Defect to them, and to then continually deny its existence and disclaim warranty coverage.

## F.   Toyota Has Not Yet Remedied The Defect

105.   Toyota has knowingly sold hundreds of Class Vehicles in the State of Georgia which suffer from the Defect. The Defect renders the Class Vehicles unreliable, causing them to become inoperable with no warning and impairing their core functionality. This Defect causes drivers of the Class Vehicles to become stranded or otherwise unable to use their Class Vehicles when needed.

106.   Defendants have issued software updates that purport to remedy the Defect but in fact do not. Multiple consumer reports authored on third party websites relay that Toyota's purported software fixes were applied to consumers' vehicles and did not work. Further, Defendants' dealers have informed consumers that the software updates apply only to a limited range of VIN numbers of the Class Vehicles.

107.    Toyota has issued a number of Service Bulletins that purport to address the Defect but none has fully resolved the issue. Each of the pertinent Service Bulletins advises the technician to perform a Data Communication Module ("DCM") reset and firmware update. The DCM is an ECM that connects to the internet, typically through cellular data networks, and allows vehicles to offer in-car wireless internet, among other amenities.

108.    An NHTSA communication pertinent to the Defect was issued on September 30, 2020. Service Bulletin T-SB-0095-20[17] states that Class Vehicles (among several other models) may experience "Depleted 12V vehicle battery when in IG-OFF," and advises that a "DCM reset and firmware update" will address this condition.

109.    The following month, Defendants filed a "Tech Tip" T-TT-0625-20 with the NHTSA, with the subject 12 Volt Battery Discharge Diagnostic Recommendations. The Tech Tip applies to "2020-21 MY Vehicles Equipped with LG DCM" (including the Class Vehicles) with discharged batteries. The Tech Tip

---

[17] This Service Bulletin superseded an earlier Service Bulletin dating to March 9, 2020, which also provided for a DCM firmware update for models including the Class Vehicles but did not recognize depleted battery as a relevant condition. T-SB-0021-20, DCM Firmware Update (LG), (Apr. 2, 2020) *available at* https://static.nhtsa.gov/odi/tsbs/2020/MC-10174887-9999.pdf (*last visited* Feb. 20, 2022).

states that a "12V Battery Discharged and / or Dead condition can be due to multiple causes. In order to properly diagnose and determine the root cause it's important to follow a structured process to identify any contributing issues and determine the proper remedy." The Tech Tip notes that some aftermarket accessories can "keep the CAN bus awake intermittently and discharge the battery." Per the Tech Tip, "If the battery tests good, please follow the directions in [T-SB-0095-20] to address battery discharge."

110.   Service Bulletin T-SB-0095-20 has been revised and superseded at least three times—first on December 14, 2020, then on January 25, 2021, and again on October 14, 2021. Each subsequent revised version has only minor changes from prior versions.

111.   On information and belief, Toyota has issued four versions of this Service Bulletin because the firmware updates disseminated pursuant in each version have failed to remedy the Defect. In the customer complaint detailed above, there are multiple accounts of customers receiving a software update from their Toyota dealer only to experience another battery failure shortly thereafter. As recently as January 25, 2022, one customer complained on ToyotaNation.com that their dealer conducted a software update that did not fix the Defect: "Could not start vehicle 1/5/2022 due to The 12v battery on my 2020 rav4. Battery checked out as good by

the dealer and they performed the TSB. Less than three weeks later the battery is dead again. Waiting for jump to take back to dealer."

## G.   Toyota Breached the Express Warranties Covering the Class Vehicles

112.   The Class Vehicles sold and leased by Toyota included a written express three-year/36,000-mile New Vehicle Limited Warranty ("NVLW"). With limited exclusions, the NVLW covers the entire vehicle—including the electric system and battery, to the extent they are defective—as well as "adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota." The repairs are to be made without charge to the customer.

113.   The NVLW identifies Toyota Motor Sales, U.S.A., Inc. as the "Warrantor."

114.   The NVLW states that it "appl[ies] to all 2020 model year RAV4 vehicles distributed by Toyota that are originally sold by an authorized dealer in the United States and normally operated or touring in the United States, U.S. territories or Canada. Warranty coverage is automatically transferred at no cost to subsequent vehicle owners."

115.   With respect to used Class Vehicles, the NVLW provides that coverage is transferred automatically, without charge, to subsequent vehicle owners. Toyota also certifies used Class Vehicles using an inspection for quality assurance. This

quality inspection encompasses the electrical system. According to a website maintained by Defendants that explains their vehicle quality inspection procedures, Defendants' agents check whether the "Battery [is] in good condition, has proper cold cranking amps and reserve capacity."

116.   The Defect arises from defective materials and/or workmanship in the Class Vehicles' electrical systems and is therefore covered under Toyota's warranties. Yet Toyota has failed and/or refused to completely remedy the Defect. Consumers who report sudden and inexplicable dead batteries of the Class Vehicles routinely have their concerns dismissed by Toyota dealers and Defendants. When a battery dies due to the Defect, Defendants deny knowledge of the Defect and deny warranty claims, claiming superior knowledge that misattributes the Defect to unrelated causes, and even forcing the consumer to pay for the replacement out of pocket or rely on their insurer to cover a portion of the cost.

117.   When owners and lessees take their Class Vehicles into Toyota dealerships for service, they are instructed to, *inter alia*, drive their vehicles every day, to drive at least twenty miles per day, or to purchase aftermarket accessories that maintain battery charge.  Class Members report that Toyota dealerships attempt to blame the defect on using their Vehicles in ordinary and foreseeable, for instance, by holding the key fob "too close" to the Vehicle, which is necessary to turn the

Vehicle on and operate it. At most, Toyota instructs the dealerships to replace the batteries in the Class Vehicles and/or complete a software update. But since Toyota is not addressing the underlying cause of the parasitic battery drain, the Defect inevitably manifests again. Absent a repair to the vehicle that resolves the parasitic draw of the electrical system, owners and lessees of the Class Vehicles will experience the Defect again. Thus, Toyota's warranty services provide only a temporary, ineffective solution, and expose their customers to repeat failure.

118.    As alleged, *supra,* Plaintiff McClure presented his Class Vehicle to an authorized Toyota dealership/repair center on four separate occasions, as well as to an independent dealership. Each time, he was informed that the dealership/repair center could not identify the source of or repair the Parasitic Drain Defect. The dealership/repair center denied the existence of the Defect while claiming superior knowledge by blaming its effects on Plaintiff's usage of the Vehicle, on road conditions, and on unrelated components of the Vehicle.

119.    Defendants drafted the New Vehicle Limited Warranty with the knowledge and intention that the Warranty should fail of its essential purpose. Defendants knew as early as January of 2019 that the Class Vehicles suffered from the Parasitic Drain Defect, and that the Defect would continue to manifest beyond the three-year, 36,000 mile limitation of the Warranty. Nonetheless, Defendants

included this limitation on their Warranty coverage, with knowledge that the coverage would be inadequate to repair and address all manifestations of the Defect that were inherent in the Vehicles at the time of their sale or lease.

120. The Defect impacts the core functionality of the Class Vehicles—when it manifests, the Defect prevents consumers from operating their automobiles and using them for reliable transportation. Toyota's refusal to honor its warranty obligations, and its preparation of warranty coverage that would necessarily fail in its essential purpose, shifts the costs of the Defect onto its customers, who must resort to purchasing larger capacity batteries and battery chargers and to vigilantly monitor the charge on their batteries in order to have a vehicle that will function as advertised, at the risk of hazardous malfunctions.

**PLAINTIFF PROVIDED NOTICE TO DEFENDANTS**

121. Plaintiff provided notice to Defendants of their claims prior to commencing this action by letter addressed to TMNA and dated March 22, 2022 ("Demand Letter"). The Demand Letter identified Plaintiff and notified Defendants that Plaintiff "intends to pursue claims against Toyota Motor Corporation, Toyota Motor North America, Inc., and Toyota Motor Sales, U.S.A., Inc. on behalf of themselves and all other similarly situated owners who purchased the 2020 Toyota RAV4 vehicles."

122.   The Demand Letter described Plaintiff's claims, the nature of the Defect, and the consequences and impacts of the Defect on the operability of the Class Vehicles, as alleged herein. The Demand Letter described Defendants' knowledge of the Defect and misrepresentations and failure to disclose to Plaintiff and Class Members, as alleged herein. The Demand Letter specified the claims and relevant provisions of law under which Plaintiff seek relief.

## CLASS ACTION ALLEGATIONS

123.   Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated.

124.   Plaintiff seeks to represent a Class of:

**All persons who purchased or leased in the State of Georgia a 2020 Toyota Rav4 in all configurations and trim levels, including the LE, XLE, XLE Premium, Adventure, TRD Off-Road, Limited, LE Hybrid, XLE Hybrid, XSE Hybrid, and Limited Hybrid, and (hereinafter, "Class Vehicle").**

125.   Excluded from the Class are Toyota, its affiliates, employees, officers, and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this action. Plaintiff reserves the right to modify, change, or expand the Class definitions based on discovery and further investigation.

126.   *Numerosity. Rule 23(a)(1)*. The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendants, Plaintiff believes, and on that basis alleges, that more than a thousand Class Vehicles have been sold and/or leased in the State of Georgia.

127.   *Existence of Common Questions of Law and Fact. Rule 23(a)(2).* This action involves common questions of law and fact, which include, but are not limited to, the following:

a.    whether the Class Vehicles were sold with the Parasitic Drain Defect;

b.    whether the ECMS and associated electrical subsystems in the Class Vehicles are defective;

c.    whether Defendants knew or should have known about the Parasitic Drain Defect, and if so, how long Defendants knew or should have known of the Defect;

d.    whether the defective nature of the Class Vehicles is a material fact that reasonable consumers would have considered in deciding whether to buy or lease a Class Vehicle;

e.      whether Defendants had and/or have a duty to disclose the defective nature of the Class Vehicles to Plaintiff and Class Members;

f.      whether Defendants omitted and failed to disclose material facts about the Class Vehicles;

g.      whether Defendants' concealment of the Defect induced Plaintiff and Class Members to act to their detriment in purchasing Class Vehicles;

h.      whether Defendants represented that the Class Vehicles had characteristics, uses, or benefits that they did not actually have;

i.      whether Defendants represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another;

j.      whether Defendants advertised the Class Vehicles with the intent not to sell them as advertised;

k.      whether Defendants' affirmative misrepresentations about the Defect were likely to create confusion or misunderstanding, and therefore were fraudulent;

l.      whether Defendants' affirmative misrepresentations about the Defect were and are deceptive;

m.      whether the Class Vehicles were unfit for the ordinary purposes for which they were sold;

n.      whether Plaintiff and other Class Members are entitled to a declaratory judgment that the ECMs and associated electrical systems in the Class Vehicles are defective and/or not merchantable;

o.      whether Plaintiff and Class Members are entitled to equitable relief, including, but not limited to, a preliminary or permanent injunction;

p.      whether Defendants should be declared financially responsible for notifying Class Members of the problems with the Class Vehicles and for the costs and expenses of permanently remedying the Parasitic Drain Defect in the Class Vehicles; and

q.      whether Defendants are obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, service, repair, or replace the defective ECMs and associated electrical subsystems.

128.   *Typicality. Rule 23(a)(3).* All members of the Class have been subject to and affected by the same conduct and omissions by Defendants. The claims alleged herein are based on the same violations by Defendants that harmed Plaintiff

and members of the Class. As alleged in this Complaint, the Parasitic Drain Defect

is caused by the same underlying design and/or manufacturing defect, and manifests

in the same way, in all of the Class Vehicles. By purchasing or leasing Class Vehicles

in transactions in which Defendants made material misrepresentations, omitted

material facts while under a duty to disclose such facts, and engaged in fraudulent

and deceptive practices in connection with the sale, leasing, and repair of the

Parasitic Drain Defect, all members of the Class were subjected to the same wrongful

conduct. Plaintiff's claims are typical of the Class's claims and do not conflict with

the interests of any other members of the Class. Defendants' unlawful, unfair,

deceptive, and/or fraudulent actions and breaches of the duty of best execution

concern the same business practices described herein irrespective of where they

occurred or were experienced.

129.   *Adequacy. Rule 23(a)(4).* Plaintiff will fairly and adequately protect the

interests of the members of the Class. Plaintiff has retained counsel experienced in

complex consumer fraud an unfair and deceptive trade practices class action

litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no

interest adverse or antagonistic to those of the Class.

130.   *Predominance and Superiority of Class Action. Rule 23(b)(3).* A class

action is superior to all other available means of fair and efficient adjudication of the

claims of Plaintiff and members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. The common, class wide issues identified, *supra*, predominate over any individual questions. It would be virtually impossible for members of the Classes individually to redress effectively the wrongs done to them. Even if the members of the Classes could afford such individual litigation, the court system could not. Individualized by litigation by hundreds of purchasers and lessors of Class Vehicles in Georgia presents a potential for inconsistent or contradictory judgments and an excessive burden on the court system. Individualized litigation increases the delay and expense to all parties, and to the Court system, presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers, warranty claims, registration records, and database of complaints.

131.   *Declaratory Relief*. Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby

making appropriate final declaratory relief, as described below, with respect to the members of the Class as a whole.

132.   Defendants have acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## CAUSES OF ACTION

### COUNT ONE:
### VIOLATIONS OF GEORGIA'S
### FAIR BUSINESS PRACTICES ACT
### (O.C.G.A. § 10-1-390-*et seq.*)
### (Against TMC, TMNA, and TMS)

133.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

134.   Plaintiff McClure brings this claim on behalf of himself and the Georgia Class against TMC, TMNA, and TMS.

135.   The purpose of the Georgia Fair Business Practices Act ("FBPA") "is to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce in part or wholly in the state." The Georgia General Assembly intends "that such practices be swiftly stopped, and [the FBPA] shall be liberally construed and applied to promote its underlying purposes and policies. makes unlawful." O.C.G.A. § 10-1-391(a).

136.   The FBPA prohibits "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce," O.C.G.A. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," O.C.G.A. § 10-1-393(b).

137.   A private FBPA claim has three elements: a violation of the Act, causation, and injury. Establishment of unfair or deceptive acts or practices, within the meaning of the FPBA, does not require proof of intentional conduct on the part of defendant.

138.   Defendants violated the FBPA by concealing, suppressing, and omitting material facts regarding the Class Vehicles. Defendants knew of the Parasitic Drain Defect through at least the following information sources that were exclusively available to Defendants: (1) testing data compiled by Defendants before their release of the Class Vehicles; (2) Defendants' records customers' complaints about the Defect to Defendants' dealers for vehicle repairs; (3) aggregate data from Defendants' dealers, including their repair records and orders; (4) consumer

complaints to the NHTSA and resulting notice from Defendants' legally required monitoring of NHTSA complaints; (5) warranty and post-warranty claims submitted to Defendants by purchasers and lessees of Class Vehicles; and (6) testing conducted in response to owner or lessee complaints.

139.   Furthermore, Defendants engaged in materially misleading and deceptive acts by continuing to sell the Class Vehicles to the consuming public and to represent that these Vehicles were in good working order, merchantable, and not defective, despite Defendants' knowledge that the vehicles would not perform as intended, represented, and warranted and that the Defect would cause purchasers and lessees to incur significant out-of-pocket costs and expenses.

140.   The defective ECMs and safety features that cause the Parasitic Drain Defect to materialize result in numerous effects that, if properly disclosed, are the type of information upon which a consumer would be expected to rely in making a decision whether to purchase, or how much to pay for, the Class Vehicles, including, but not limited to: premature battery failure, excessive wear on the alternator, failure of safety features such as headlights, taillights, and hazard lights, unpredictable engine stalling, and malfunctioning of the steering system.

141.   Plaintiff and the Class justifiably relied on Defendants' representations contained in its nationwide marketing and promotional campaign, and in its uniform

misrepresentations and material omissions at the point of sale, which failed to disclose the Defect. In addition, Plaintiff and Class Members have repeatedly confronted Defendants with the apparent falsity of their representations concerning the normal battery life of the Class Vehicles and of the safety and reliability of the Class Vehicles, only to have Defendants disavow the existence of the Defect, asserting superior knowledge. Plaintiff individually has presented his Class Vehicle to Defendants for repair of the Parasitic Drain Defect on four separate occasions. As alleged in the Complaint, Class Members have similarly presented their Vehicles to Defendants for repair. As alleged, Defendants have disclaimed that the Defect exists in the Vehicle and have attempted to blame the Defect on Plaintiff's and Class Member's ordinary usage of the Vehicle or to attribute the symptoms of the Defect to unrelated Vehicle components.

142.    Plaintiff and Class members—the purchasers and lessees of the Class Vehicles—have repeatedly confronted Defendants with the falsity of their representations by at least the following methods: (1) repeatedly complaining to Defendants' authorized dealerships about prematurely drained batteries, malfunctioning power steering mechanisms causing the Class Vehicles to drift between lanes, dimmed headlights and taillights, unpredictable stalling and/or instances of the Class Vehicle failing to turn on at all; (2) bringing Class Vehicles to

authorized dealerships for repairs of these and other effects of the Parasitic Drain Defect, which Defendants are aware of, at least in the form of aggregate data from authorized dealerships; (3) submitting consumer complaints to the NHTSA that are monitored and read by Defendants; (4) posting complaints about prematurely expired batteries and other malfunctions caused by the Defect in on-line consumer forums that Defendants routinely monitor as part of their sales and marketing efforts; and (5) submitting warranty and post-warranty claims to Defendants for the malfunctions caused by the Defect.

143. Nonetheless, and despite receiving these complaints about the Defect through numerous channels, Defendants have at all times failed to disclose and knowingly concealed the Defect, its true cause, and the extent of its effects, from Plaintiff and from the Class. Despite being repeatedly confronted through multiple channels with complaints of the Defect, Defendants have continued either to deny the existence and extent of the Defect, to blame consumers for its consequences, or to misattribute the source of the Defect. Defendants have also instructed their dealers to conceal the Defect, as alleged, by taking measures to ensure that the Vehicles' batteries appear to be in working order immediately before delivering the Class Vehicles to lessees and purchasers, knowing that, because of the Defect, that batteries will like fail soon after delivery.

144.   Further, when Defendants do provide repair services, they fail to repair or replace the malfunctioning ECMs, safety features, and other malfunctioning electrical system components. Instead, they offer repairs to extraneous and unrelated vehicle components or ineffective software updates that failed to remedy the problem, or seek to profit further from the Defect by directing consumers to buy battery replacements and exogenous power sources that would have been unnecessary if the underlying Defect were repaired.

145.   Defendants further did not disclose the Parasitic Drain Defect in any pre-sale literature provided to Plaintiff, or in any information provided to him by the Defendants' dealership. Defendants knew and intended that Plaintiff and Class Members would rely on the material non-disclosures and knowing concealment of information about the Defect, because Defendants omitted information about the Defect in marketing and promotional materials and in point-of-sale information that Defendants provide to Plaintiff and Class Members, directly or through their agents, for purposes of inducing consumers to purchase or lease the Class Vehicles.

146.   To this day, Defendants continue to violate the FBPA by actively concealing  material information about the Parasitic Drain Defect from consumers and by representing to Plaintiff and members of the Class that the Class Vehicles are defect-free and safe, and that the Class Vehicles' batteries last for the normal lifespan

on 3-5 years, in its nationwide marketing and promotional materials, point-of-sale information provided to consumers by Defendants' authorized dealerships, and information provided by Defendants' dealership repair centers.

147.   Defendants also violated the FBPA in their administration of the New Vehicle Limited Warranty by misidentifying the Parasitic Drain Defect as inhering in vehicle components that were not the source of the Defect in order to place the symptoms of the Defect outside of warranty coverage. Defendants drafted the NVLW with the knowledge that its year and vehicle mileage limitations would place most claims for repair of effects of the Defect outside the coverage of the warranty.

148.   As a direct and proximate result of these unfair acts or practices, Plaintiff and Class Members have been damaged because: they bought or leased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would have, paid for diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect.  Meanwhile, Defendants have sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, thereby unjustly enriching themselves.

149.   Based on the foregoing, Plaintiff McClure and the Class seek actual damages against Defendant in an amount to be determined at trial and statutory,

treble, and/or punitive damages under the Georgia FBPA. Plaintiff McClure and the Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the Georgia FBPA.

**COUNT TWO:**
**BREACH OF EXPRESS WARRANTY**
**(O.C.G.A. §§ 11-2-313 &  11-2A-210)**
**(Against TMS only)**

150.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

151.   Plaintiff McClure brings this claim against TMS on behalf of himself and the Class.

152.   O.C.G.A. §§ 11-2-313 & 11-2A-210 provides that express warranties are created by:

(a) Any affirmation of fact or promise made by the seller [or lessor] to the buyer [or lessee] which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

80

153.   TMS is and was at all relevant times a "seller" of motor vehicles under O.C.G.A. § 11-2-103(1)(d).

154.   With respect to leases, TMS is and was at all relevant times a "lessor" of motor vehicles under O.C.G.A. § 11-2A-103(1)(p).

155.   The Class Vehicles are and were at all relevant times "goods" within the meaning of O.C.G.A. §§ 11-2-105(1) and 11-2A-103(1)(h).

156.   TMS provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, TMS's warranties are express warranties under Georgia law.

157.   Specifically, the Class Vehicles are covered by TMS's New Vehicle Limited Warranty ("NVLW"), including a 3-year/36,000 miles warranty that provides coverage on all components other than normal wear and maintenance items. The "NVLW" covers "repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota." Furthermore, TMS's warranty provides that "[w]arranty coverage is automatically transferred at no cost to subsequent vehicle owners." TMS is obligated, under the terms of the express warranties, to make repair and/or replacements to permanently correct the Parasitic Drain Defect for Plaintiff and Class Members.

158.   The NVLW identifies TMS as the Warrantor.

159.   As described above, the ECMs, safety features, and related electrical systems in the Class Vehicles are manufactured and installed with the Parasitic Drain Defect by TMS in the Class Vehicles. TMS supplied the defective parts causing the Defect in the Class Vehicles, and said parts are covered by TMS's warranties granted to all Class Vehicle purchasers and lessors. The Parasitic Drain Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiff and Class Members.

160.   TMS knew of the Parasitic Drain Defect and that this Defect poses serious safety risks to consumers like Plaintiff and Class Members, when it expressly warranted against the Defect, wrongfully and fraudulently concealed material facts regarding the Defect, failed to inform Class Members that the Class Vehicles had the Defect, induced Plaintiff and Class Members to buy or lease the Class Vehicles under false and/or fraudulent pretenses, and continued to deny the existence of the Defect and that the Defect was the cause of the premature depletion of the batteries of Class Vehicles when presented for repair by Plaintiff.

161.   Plaintiff and Class Members were either in privity with TMS as original purchasers or lessees, or otherwise afforded the benefits of the express warranty as subsequent purchasers because the warranty itself states that ""[w]arranty coverage is automatically transferred at no cost to subsequent vehicle owners."

162.   TMS breached these warranties by selling and leasing Class Vehicles with the Parasitic Drain Defect, requiring repair or replacement within the applicable warranty periods, and refusing and/or failing to honor the warranties by providing free repair or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

163.   As detailed above, TMS was provided with appropriate notice and has been on notice of the Defect and of its breach of express written warranties. In any event, TMS knew about the defect at the time it sold the Class Vehicles to Plaintiff McClure and the Georgia Class but concealed the Defect as a means of avoiding compliance with their warranty obligations. Moreover, TMS was given notice of these issues within a reasonable amount of time by the numerous complaints it was receiving and became aware of online.

164.   Plaintiff gave TMS a reasonable opportunity to cure its failures with respect to its warranties, and TMS failed to do so. In any event, affording TMS another opportunity to cure its breach of written warranties was unnecessary and futile here. When Plaintiff and other Class Members sought relief under the warranty, Defendants refused to do so and charged them for temporary, inadequate "fixes" that did not address the causes of the Defect. Plaintiff and Class Members consistently report that Defendants cannot repair the Defect.

165.   At all times that the Defect manifested in Plaintiff McClure's Class Vehicle and that he presented his Class Vehicle to Defendants for repair, he had driven his Vehicle for fewer than 36,000 miles and the Vehicle was less than three years old. Nevertheless, the time and vehicle mileage limits contained in TMS's warranty period were unconscionable and inadequate to protect Plaintiff and the members of the Georgia Class. When consumers seek relief pursuant to the warranty, TMS fails to repair the underlying source of the Parasitic Drain Defect. Instead, TMS offers a series of "quick fixes" that fail to repair the cause of the Defect, making it all but certain that the Defect will recur outside of the warranty period.  In addition, TMS systematically seeks to place the repairs requested by consumers outside the warranty and charging consumers for these ineffectual repair attempts (e.g., by replacing Vehicle batteries, or by selling consumer exogenous power sources), or by blaming consumers for using the Vehicles in ordinary and foreseeable ways (e.g., by bringing the keys close to Vehicle).

166.   TMS knew of the Defect in the Class Vehicles, and further knew it had and continues to have no way to repair the actual cause of the Defect, rendering it inevitable that the Defect would recur outside the warranty period. Nevertheless, TMS crafted its warranty in such a way as to ensure that the effects of the Defect would continue to occur outside the time and mileage durations of its warranties.

TMS also knew that the materialization of the Parasitic Drain Defect would substantially deprive Plaintiff and Class Members of the benefit of their purchaser or lease of the Class Vehicles, since the Defect causes the Class Vehicles to fail in their essential functions. TMS knew, among other things, that Plaintiff and the members of the Georgia Class had no meaningful choice in determining these time limitations, the terms of which unreasonably favored TMS. A gross disparity in bargaining power existed between TMS and members of the Georgia Class because TMS knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives. Accordingly, the purported limitations in TMS's warranties are procedurally and substantively unconscionable and thus fail under U.C.C.§ 2-302.

167.   Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable because TMS knowingly sold a defective product whose defects TMS also knew would continue to manifest outside the warranty period.

168.   TMS has failed and has refused to repair the Defect when presented for repair by Plaintiff.

169.   As a direct and proximate cause of TMS's breach, Plaintiff McClure and the other Georgia Class members bought or leased Class Vehicles they otherwise

would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

170.   As a direct and proximate result of TMS's breach of express warranties, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including out-of-pocket costs and the costs of needed present and future repairs, in an amount to be determined at trial, and are entitled to the relief requested.

**COUNT THREE:**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTIBILITY**
**(O.C.G.A. §§ 11-2-314 & 11-2A-212)**
**(Against All Defendants)**

171.   Plaintiff McClure realleges and incorporates by reference all preceding allegations as though fully set forth herein.

172.   Plaintiff McClure brings this claim on behalf of himself and the Class against all Defendants.

173.   O.C.G.A.  §11-2-314(1) provides, as to sales, that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." O.C.G.A. § 11-2A-212(1) provides, as to leases, that "[e]xcept in a finance lease, a warranty that the goods will be

merchantable is implied in a lease contract if the lessor is a merchant with respect to goods of that kind."

174.   To be merchantable in conformity with the implied warranty, goods that are sold or leased must, among other requirements, "[p]ass without objection in the trade under the contract description," be of "fair average quality within the description," and be "fit for the ordinary purposes for which such goods are used." O.C.G.A. §§ 11-2-314(2) & 11-2A-212(2).

175.   Defendants are and were at all relevant times a "merchant" with respect to motor vehicles under O.C.G.A. §§ 11-2-104(1) and 11-2A-103(3).

176.   The Class Vehicles are and were at all relevant times "goods" within the meaning of O.C.G.A. §§ 11-2-105(1) and 11-2A-103(1)(h).

177.   A warranty that the Class Vehicles were in merchantable condition at the time of their purchase or lease and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to O.C.G.A. §§ 11-2-314 and 11-2A-212.

178.   Defendants impliedly warranted that the Class Vehicles, which it designed, manufactured, sold, or leased to Plaintiff and members of the Class were merchantable, fit and safe for their ordinary use, not otherwise injurious to consumers, and would come with adequate safety warnings. Defendants manufactured the Class Vehicles with ECMs, safety features, and associated

components of their electrical systems so as not to be fit for the ordinary purposes for which they are used. As alleged herein, due to Defendants' faulty design, manufacture, and/or installation of ECMs, safety features, and electrical system components, the Class Vehicles suffer from the Parasitic Drain Defect. The Defect causes these defective components of the Class Vehicles to continue to drain the Vehicles' battery at a rate when the battery is turned off that is higher than is normal or necessary to maintain the systems associated with the defective ECMs, safety features, and electrical system components. The excessive drain on the battery caused by the Defect results in the Class Vehicles' malfunctioning in several ways that render them unfit for their intended use as a safe and reliable mode of personal transportation, including:

(a) Premature battery expiration prior to the normal life of the battery as represented by Defendants for the Class Vehicles (i.e., 3-5 years), which causes the engine to fail to turn on, and associated safety features such as the headlights, taillights, interior lights, and hazard lights to fail;

(b) Dimming and malfunctioning of the Vehicles' safety features, including the headlights, taillights, interior lights, and hazard lights, while the Vehicle is in operation;

88

(c) Malfunctioning of the power steering system, which causes the Vehicle to drift off-center while the Vehicle is in operation, including while driving at high speed; and

(d) Stalling of the engine while the Vehicle is in use.

179. Defendants' breach of the implied warranty on the Class Vehicles caused injury to Plaintiff and members of the Class. Injury for purposes of breach of an implied warranty of merchantability arises when the seller fails to tender the goods in a manner that is fit for ordinary purposes. Defendants manufactured and sold Class Vehicles to Plaintiff and the Georgia Class that were not fit for ordinary purposes, because the Class Vehicles were, at the time of sale by Defendants, equipped with ECMs, safety features, and associated electrical system components that caused the Defect and the consequences of the Defect to materialize in the Class Vehicles.

180. Plaintiff and Class Members were either in privity with all Defendants as original purchasers or lessees or as subsequent purchasers because the warranty itself states that ""[w]arranty coverage is automatically transferred at no cost to subsequent vehicle owners." The New Vehicle Limited Warranty states that TMS is the "Warrantor." TMNA controls the operations of TMS; as TMNA admits on its website, "[s]ince 2017, as part of "One Toyota" initiative, all operations in North

America (R&D, manufacturing, sales, marketing, after sales and corporate functions) are conducted under 'Toyota Motor North America (TMNA).'" As alleged, TMNA and TMS act as TMC's agents for all commercial purposes in the United States.

181.   Plaintiff and other Class members have had sufficiently direct dealings with either Defendants or their agents – such as their dealerships, customer and consumer affairs departments, and technical support – to establish privity of contract between Defendants on one hand, and Plaintiff and each of the other Class members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Additionally, privity is excused here because Plaintiff and each of the other Class members relied on statements made by Defendants themselves in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform, and was controlled and disseminated directly by Defendants.

182.   As a direct and proximate result of Toyota's breach of the implied warranty of merchantability and fitness for a particular purpose, Plaintiff and members of the Georgia Class suffered damages including loss of value of the Class Vehicles and repair and replacement costs.

183.   Plaintiff McClure and the Georgia Class members are, therefore, entitled to damages in an amount to be proven at the time of trial.

## COUNT FIVE:
## UNJUST ENRICHMENT
### (Against All Defendants, in the Alternative to Count Two)

184.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

185.   Plaintiff brings the following Count on behalf of himself and of the Class against all Defendants, in the alternative to Count Two.

186.   A claim for unjust enrichment has the following elements (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit without the payment of its value.

187.   Plaintiff and the Class conferred a benefit on Defendants by paying Defendants to purchase or lease the Class Vehicles.

188.   Defendants knew that this benefit was conferred on them.

189.    Defendants accepted and retained the benefit of Plaintiff and the Class's payments without providing in exchange Class Vehicles that were of equivalent value to the payment. The Class Vehicles were not of equivalent value because they were sold and/or leased without disclosure of the existence, causes, and effects of the Parasitic Drain Defect that affects the Class Vehicles. Because the Defect was not disclosed, the price that Plaintiff and the Classes paid for the sale or lease of the Vehicle was higher than it would have been, had the Class Vehicles been free of the Defect.

190.    Defendants were further unjustly enriched at the expense of Plaintiff and the Classes because the Vehicles were purchased under a warranty that, as alleged, failed of its essential purpose. Although the warranty purports to warrant the Vehicles for "repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota," in fact, Defendants are unable to honor the warranty because they have never developed or implemented any adequate repair for the Defect. Accordingly, Plaintiff and the Classes have paid Defendants for a warranty that fails of its essential purpose. Because the purchase and/or leasing price of the Class Vehicles incorporates the value of the warranty, Defendants have acceptance and retained a benefit from Plaintiff and the Class without the payment of its value.

191.   As alleged, Defendants were aware of the Defect at the time of the sale or leasing of the Class Vehicles to Plaintiff and have at all times sought to conceal its causes and effects from Plaintiff and the Class, including by misattributing the effects of the Defect to other Vehicle components in order to avoid their warranty obligations and to avoid disclosing that they are unable to repair the Defect.

192.   Defendants have been unjustly enriched at the expense of Plaintiff and the Class, and its retention of this benefit under the circumstances would be inequitable.

193.   Plaintiff, on behalf of himself and of the Class, demands judgment against Defendants for damages, disgorgement of profits, and all other relief that would be just and equitable.

## COUNT SIX:
### FRAUDULENT CONCEALMENT
### (Against TMC, TMNA, and TMS)

194.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

195.   Plaintiff McClure brings this Count individually and on behalf of the Class against Defendants TMC, TMNA, and TMS.

196.   Under Georgia law, fraudulent concealment has the following elements: (1) a false representation or omission of a material fact; (2) scienter; (3)

intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages.

197.   Defendants made false representations and material omissions and fraudulently concealed a presently existing or past fact, including by the following conduct:

(1) Consistently representing in their marketing and promotional materials disseminated widely over the internet and provided in-person through their authorized dealers that the Class Vehicles are safe and reliable, and that the Class Vehicles reliably start when the Vehicle operator attempts to turn them on.

(2) Consistently representing in information supplied through their authorized dealerships that the batteries of the Class Vehicles last 3-5 years.

(3) Omitting to disclose in their marketing and promotional materials provided on-line, on television, and at the point of sale, that:

(a) The Class Vehicles were manufactured, installed, and sold and leased to consumers with defective ECMs, safety features such as headlights, taillights, hazard lights, and interior lighting, and associated electrical components that cause the Vehicles' battery to drain more rapidly than at the rate of a normally functioning vehicle, causing the battery to lose charge and

require replacement before the expiration of the normal battery lifecycle advertised by Defendants;

(b) That the failure of the Class Vehicles' batteries results in numerous safety hazards, including failure of the Vehicle to turn on when the ignition is engaged by the user, stalling of the engine while the Vehicle is running, dimming and failure of the headlights, taillights, interior lights, and/or hazard lights, excessive strain on the alternator causing it to fail and require replacement before the expiration of its normal period of use, and causing the power steering to malfunction, which causes the Vehicle to drift off-center while driving with the steering wheel held in a centered position.

198.   Defendants suppressed and concealed this information, despite having actual knowledge of it from at least the following sources that were exclusively in their possession: (1) pre-release testing data; (2) their own records of customers' complaints about the Defect to Defendants' dealers for vehicle repairs; (3) aggregate data from Defendants' dealers, including their repair records and orders; (4) consumer complaints to the NHTSA and resulting notice from the NHTSA; (5) warranty and post-warranty claims; (6) testing conducted in response to owner or lessee complaints; and (7) other internal sources of aggregate information about the problem.

199.   Defendants continue to suppress and conceal the source of the Defect, and continue to misrepresent the nature and extent of the Defect, by failing to adequately diagnose and repair the source of the Defect, failing to recall the Class Vehicles in light of their knowledge of the Defect and its effects, and by blaming consumers for using their Class Vehicles in ordinary ways (such as by holding the keys close to the Vehicle, as required to operate it) instead of admitting and repairing the true source of the Defect.

200.   Defendants fraudulently and maliciously seek to profit from the misrepresentation and concealment of the Defect by instructing Class Members to buy from Defendants additional or replacement Vehicle components or exogenous power sources, such as replacement batteries, alternators, and jumper cables.

201.   Defendants, by these acts and omissions, intended to and did induce Plaintiff and Class Members to purchase or lease the Class Vehicles, and to refrain from purchasing or leasing other vehicles that would serve as substitutes, as they included them in their marketing and promotional materials and information provided to prospective purchasers and lessors at the point-of-sale or -lease materials, whose purpose is to persuade consumers to purchase or lease the Class Vehicles. Defendants knew that Plaintiff and Class Members would not be able to test the Class Vehicles or to detect the source of the Defect in the ECMs, safety

features, and associated electrical systems prior to purchasing or leasing the Vehicles and suffering from the effects of the Defect. Defendants sought to profit from and exploit Plaintiff's and Class Members' lack of knowledge, and lack of opportunity to find out, about the Defect by concealing information about the Defect and instead, misrepresenting the Class Vehicles as safe and reliable. Plaintiff and Class Members could not have discovered the Defect before purchasing the Class Vehicles and before they started to manifest the effects of the Defect because they had no opportunity to test the ECMs, safety features, and associated electrical systems of the Class Vehicles before purchasing them, and because Defendants assured them that the Vehicles were safe and fit for their ordinary purposes.

202. By misrepresenting and concealing the existence, cause, and consequences of the Defect before and at the time of purchase or leasing by Class Members, Defendants intended to and did profit from the misrepresentation and concealment by inducing Class Members to purchase or lease the Vehicles. By misrepresenting and concealing the existence, cause, and consequences of the Defect before and at the time of purchase or leasing by Class Members, as well as thereafter when Class Members present the Vehicles to Defendants' authorized dealerships for repair, Defendants intended to and did benefit by:

(a)   protecting and increasing Defendant's market share and brand image;

(b) inducing Class Members to purchase from Defendants additional products and services (such as replacement batteries, jumper cables, other exogenous power sources, and the cost of mechanics' labor) that were insufficient to repair the Defect, and that would have been unnecessary but for the existence and effects of the Defect.

203.   Defendants had a duty to disclose the Defect in the Class Vehicles because its existence, causes, and effects were known and/or accessible only to Defendants; Defendants had superior knowledge and access to the facts, and Defendants knew the facts were not known to, or reasonably discoverable, by Plaintiff and Class Members. Defendants also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, safety, and reliability. Even when faced with complaints regarding the Defect, Defendants misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles at least twice, first, when they purchased or leased

the at purchase/lease, and again, when the premature battery failures and other consequences of the Defect were complained of to Defendants.

204. The omitted and misrepresented facts and information were material to Plaintiff and Class Members because they directly concern the quality, safety, reliability, and value of the Class Vehicles. Had Plaintiff known that the Class Vehicles suffered from the Defect, Plaintiff would not have purchased the Class Vehicle or would have paid substantially less for it. Whether the Class Vehicles were of the quality, safety, and reliability represented by the manufacturer and distributor of the Vehicles was and is a material concern to Plaintiff and Class Members.

205. Plaintiff and Class Members relied justifiably on these misstatements and omissions, as consumers are entitled to rely on product information provided by the manufacturer and distributor, and as the information that was materially omitted, concealed, and suppressed, was exclusively in Defendants' possession. Plaintiff and other Class members did not, and could not, discover the Defendants' deception on their own before leasing or purchasing a Class Vehicle and suffering the effects of the Parasitic Drain Defect.

206. Plaintiff and Class Members suffered damage in the form of overpaying for the Class Vehicles, deprivation of a safe and reliable means of transportation

according the specifications advertised by Defendants, and paying out-of-pocket costs to compensate for the Defect.

207.   Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiff McClure and the Class. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof

## **RELIEF REQUESTED**

208.   Plaintiff, on behalf of himself and all others similarly situated, requests the Court to enter judgment against Defendants, as follows:

A.   A declaration that the ECMs and associated electrical components have a defect that results in parasitic drain on the battery of the Class Vehicles, causing the battery to discharge and cease to function before the expiration of its expected lifecycle;

B.   a declaration that Defendants must, at their own expense, notify the owners and lessees of the Defect;

C.   a declaration that any limitation on the Class Vehicle's warranty that would avoid responsibility for the Defect is void;

D.     an award to Plaintiff and Class Members of compensatory, exemplary, punitive, and statutory damages, including interest, in an amount to be proven at trial;

E.     an order requiring Defendants to disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten revenue they received from the sale or lease of the Class Vehicles, or to make full restitution to Plaintiff and Class Members;

F.     an award of attorneys' fees and costs, as allowed by law;

J.     an award of pre-judgment and post-judgment interest, as provided by law;

G.     all other relief to which Plaintiff and the Class are entitled as provided by Fed. R. Civ. P. 54(c).

## JURY DEMAND

Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

Dated:  September 27, 2022.

Respectfully submitted,

**CARROLL LAW FIRM LLC**

*/s/ Stacey A. Carroll*
Stacey A. Carroll
Georgia Bar No. 112730

295 W. Crossville Rd., Suite 730
Roswell, GA 30075
Phone: (404) 816-4555
Fax: (404) 481-2074
stacey@carroll-firm.com


**MIGLIACCIO & RATHOD LLP**

Nicholas A. Migliaccio, Esq.,
Bar No. 484366
Jason S. Rathod, Esq.
Bar No. 1000882
412 H St., NE
Suite 302
Washington, DC 20002
(202) 470-3520 (Tel.)
(202) 800-2730 (Fax)
nmigliaccio@classlawdc.com

*Pro Hac Vice Application Forthcoming*

*Counsel for Lead Plaintiff and Lead Counsel for the Class*